**EQUITABLE SURETY CO. v. BOARD OF COM'RS OF MUDDY BOTTOM SWAMP LAND DIST. NO. 1, TIPPAH COUNTY, MISS.**

(Circuit Court of Appeals, Fifth Circuit. March 20, 1916.)

No. 2780.

1. PRINCIPAL AND SURETY ☜117— DISCHARGE OF SURETY—BREACH OF CONTRACT.

Where a surety company signed a contractor's bond after receiving a draft of the contract providing that advances should be made only as work progressed, the owner, having made advances contrary to the contract on which the bond was issued, cannot recover against the surety

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 283–285; Dec. Dig. ☜117.]

---

2. PRINCIPAL AND SURETY ☞162(2)—ACTIONS—EVIDENCE—JURY QUESTION.

In an action on a contractor's bond, evidence *held* to raise the questions for the jury whether surety relied on the contract in executing bond, and whether plaintiff made advances contrary to the terms of the contract.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. § 443; Dec. Dig. ☞162(2).]

3. PRINCIPAL AND SURETY ☞39—DISCHARGE OF SURETY—MISREPRESENTATIONS.

A surety on a contractor's bond will be discharged where, through collusion between the contractor and plaintiff, the contract recited a greater consideration than was actually to be paid, which false recital enhanced the risk.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 82–85; Dec. Dig. ☞39.]

4. PRINCIPAL AND SURETY ☞162(2)—ACTIONS—EVIDENCE—JURY QUESTION.

In an action on a contractor's additional bond, the question whether there was an increased hazard as to which the surety company was not informed, but of which plaintiff knew, it having been caused by its unauthorized advances to the contractor, *held* under the evidence for the jury.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. § 443; Dec. Dig. ☞162(2).]

Walker, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Northern District of Mississippi; Henry C. Niles, Judge.

Action by the Board of Commissioners of Muddy Bottom Swamp Land District No. 1 of Tippah County, Mississippi, against the Equitable Surety Company and another. There was judgment for plaintiff, and defendant named brings error. Reversed and remanded.

C. L. Sivley, of Memphis, Tenn., for plaintiff in error.

Lester G. Fant, of Holly Springs, Miss., and Thomas E. Pegram, of Ripley, Miss., for defendant in error.

Before PARDEE and WALKER, Circuit Judges, and NEWMAN, District Judge.

NEWMAN, District Judge. This case comes before this court for review of the judgment of the District Court of the Northern District of Mississippi, in a suit by the board of commissioners of Muddy Bottom Swamp Land District No. 1 of Tippah County, Miss., against the Delta Drainage Company and the Equitable Surety Company. The suit in the District Court, which had been removed from the state court, was to recover on the bond executed by the Delta Drainage Company, with the Equitable Surety Company as surety, for the faithful performance by the Delta Drainage Company of a contract made by it with the commissioners of the Muddy Bottom Swamp Land District No. 1, for the digging of a canal through the district for which the commissioners were acting. Two bonds were given, and both are in suit; one for $5,000, executed on the 15th day of January, 1912, and the second for $2,500, executed on the 20th day of May, 1912. There was a trial of the case and a verdict and judgment for the plaintiff for $7,361.71. It is for errors alleged to have been committed

in this trial that the case is brought here by the Equitable Surety Company.

The contract between the Delta Drainage Company and the commissioners is as follows:

"Whereas, Muddy Bottom Swamp Land District No. 1, Tippah County, Mississippi, through its duly authorized commissioners, W. L. McBride, Chairman, W. E. Pegram and W. T. Brumley, is desirous of having a canal cut in and for the said district, to be laid out by a civil engineer, approximately as shown by the map of said district, now on file, in the office of the clerk of the board of supervisors of the said county; and whereas, for the said purpose, the said board of supervisors of the said county has duly issued bonds, at the instance of the said district, in the sum of $25,000.00 (twenty-five thousand dollars), which bonds have been duly sold and the proceeds thereof now in the hands of the said commissioners; and whereas, the said commissioners, in session, in said county, on the 10th day of February, 1912, regularly rewarded the Delta Drainage Company of Memphis, Tennessee, a firm composed of John W. Buford, owning one-half, Charles B. Bright, owning one-fourth, and James M. Bridge, owning one-fourth, the contract of cutting the said canal; and whereas, it is proper for the protection of the parties to this contract, and interested in the said work, that contract is drawn entered into between them: Therefore, it is hereby agreed and solemnly bargained between the said Muddy Bottom Swamp Land District, by its said commissioners, hereinafter called the first party, and the Delta Drainage Company, hereinafter called the second party:

"First. The first party may audit all bills for labor, material, expense, freight, rent on machinery, salary and yardage, seeing that no bills are allowed, except in instances where said salary, labor, materials, expenses, rents on machinery, etc., on requisition from the said company, are actually for the use and proper benefit of the said proposed canal, however, the said commissioners may, at any time decline to honor any requisition, if in their judgment, a proper amount of work on the said canal has not been done and completed to warrant the issuance thereof. And in no event, is the aggregate of said bills to exceed the sum of $19,500.00, which is the price agreed upon to be paid for the service and work to be done by the second party, as hereinafter set out; said payments shall not be oftener than once a week.

"Second. That the first party is to secure and maintain for the second party a right of way of the width of fifty feet, the same being twenty-five feet from the center of the canal from each direction, during the time that the said work of the digging and clearing out of the said canal is progressing; all expense incident to the carrying out of this feature of the contract is to be borne by the first party.

"Third. The second party agrees to so clear the said right of way, as may be necessary to cut the said canal; the timber so cut in the clearing thereof is to belong to the second party, that is, so much of it as is needful for them in the carrying out the work of said canal as fuel, timbers, etc.

"Fourth. Said second party shall cut and remove, in addition to the clearing of the said right of way, to the right and to the left of said canal, the sum of one hundred and eighty-three thousand cubic yards of dirt in and from the said canal, as is shown by the aforesaid map, at and for the sum of $19,500.00. This canal is to be of the size and dimensions as to be determined by the civil engineer, who will hereafter specify grades, sections, etc. If it is found that the said civil engineer determines that there are more than one hundred and eighty-three thousand yards of earth to be removed from the said canal, or the commissioners decide that they want the canal larger so as to require more than the said one hundred and eighty-three thousand yards removed, it is agreed that the party of the second part is to have in addition to the $19,500.00 the sum of 9⅓ cents per cubic yard, according to the general terms of the contract.

"Fifth. The second party shall pay and be chargeable with all bills for labor, salaries, machinery, machinery rent, freight, expenses, estimated yardage and all other cost of clearing the right of way and cutting said canal of one

hundred and eighty-three thousand cubic yards of dirt, except as a part heretofore set out as chargeable to first party.

"It is further solemnly agreed and bargained between the parties hereto that the remaining portion, if any so remains, of the said $19,500.00, after paying out the bills heretofore described, be paid to the Delta Drainage Company, upon the completion of the one hundred and eighty-three thousand cubic yards and the acceptance of the said work by the said commissioners.

"It is further agreed and understood that all reasonable diligence and activity must be exerted by the second party to accomplish the proper completion of this work, but the second party is to have proper and fair time to do same.

"And that the second party is to begin the work of digging the said canal at the lower, or northern, end of the same, on deposit of the said $19,500.00, as hereinbefore mentioned. The second party will furnish, as a part of this contract, a contractor's bond in the sum of $5,000.00 for the faithful performance of this contract.

"It is expressly understood that nothing in this contract shall be so construed as to require the contractors to change the size of the canal, where once cut according to engineer's specifications."

It will be seen from this contract that the commissioners were to audit all "bills for labor, material, expense, freight, rent on machinery, salary, and yardage, seeing that no bills were allowed except in instances where said salary, labor, materials, expenses, rents on machinery, etc., on requisition from the said company, are actually for the use and proper benefit of the said proposed canal, however the said commissioners may, at any time, decline to honor any requisition, if in their judgment, a proper amount of work on the said canal has not been done and completed to warrant the issuance thereof." It was evidently contemplated that payments should be made by the commissioners to the drainage company as the work progressed. The amount to be received by the drainage company is also stated to be $19,500 if the work then contemplated only was done and no new work ordered. If there was any new work ordered, the drainage company was to receive 9⅓ cents per cubic yard for all earth removed in addition to that provided for in the contract and for which the $19,500 was to be in full payment.

Two of the defendant's pleas interposed in this case are as follows:

### "Special Plea No. 1.

"For a further plea in this behalf, the said Equitable Surety Company avers, and will show on the trial of this cause that the $4,500 alleged to have been advanced to the Delta Drainage Company, by plaintiff for the purpose of purchasing a dredge boat, if advanced at all, was done without authority of law, and contrary to the statute of the state of Mississippi, and the law under which the plaintiff so operated, and was not provided for or contemplated by the terms of the contract, which plaintiff had with the Delta Drainage Company, and was not within the contemplation of the contract that the Equitable Surety Company here is sued upon and incurred no obligation upon it as surety for the Delta Drainage Company, and was ultra vires, and unlawful, and for which the defendant Equitable Surety Company is in no way liable under the law, or its contracts as surety, and this it is ready to verify.

### "Special Plea No. 2.

"For further plea in this behalf, the said Equitable Surety Company, defendant, will show that $1,500 or more of the alleged cash advanced was never in fact advanced to the Delta Drainage Company, by plaintiff, but the item came about in this way: The bonds of said district which aggregated about $24,000 were unlawfully and in violation of a positive statute of the state of

Mississippi, under which said district was organized, sold for at least $1,500 below par, and, in order to evade said statute requiring that said bonds shall not be sold for less than par, the said plaintiff unlawfully and fraudulently charged the Delta Drainage Company with the said difference between the par value of the bonds and the actual amount for which they were sold, and that the said attempted transaction in so far as it affects the Equitable Surety Company is unlawful, fraudulent, and void, and this the said Equitable Surety Company is ready to verify."

The questions made by these pleas were, we think, two of the most important ones raised on the trial of the case  As to the payment by the commissioners to the drainage company of $4,500 before the work was commenced, for the purpose of buying a dredging machine, it appears that this payment was made on February 27, 1912, apparently before any work at all had been done by the dredging company in constructing the canal.  Plea No. 2, and the question which runs all through the case, is that the drainage company was to receive only $18,000 for the work to be done by it in digging the canal; whereas, it was represented to the Equitable Surety Company that they were to receive $19,500, and that they became surety with this understanding.

On the trial of the case, at the close of all the evidence, the defendants requested the court to give peremptory instructions to the jury in favor of the defendants, which motion was overruled by the court.

After argument by counsel, the court charged the jury.  The charge seems to have been to read to the jury the plaintiff's declaration, and then to say to them, after stating the defendant's plea of "not guilty":

"The burden of proof rests on plaintiffs to satisfy your minds by a preponderance of the evidence of the truth of every material allegation in this declaration.  If the plaintiffs have so satisfied your minds, it will be your duty to return a verdict for the plaintiff for the amount, I think it is $7,360 odd dollars.  You can make the calculations yourselves.

"It is claimed on part of the defendants that one of the reasons for not complying with the contract was that the commissioners so acted as to demoralize and injure the employment of their hands, and but for that they would have been able to complete the contract.  As request for instructions along that line has been made, I give you the instruction: 'If you should find from the proof that the commissioners, the plaintiff in this case, interfered with the laborers of the Delta Drainage Company, and so disorganized the labor that the. manager, C. B. Bright, could not proceed to carry out his contract, and then offered him a consideration to give up and surrender the contract, and that on this account and at the suggestion and instance of said plaintiff, commissioners, the said defendant, Delta Drainage Company, did surrender said contract and turn the work over to said commissioners, you should find for the defendant.' "

The court then proceeded:

"I also grant this instruction: 'The court instructs the jury if they find from the evidence that commissioners, members of the Muddy Bottom Drainage District No. 1, interfered with the hands or employés and prevented them from work by disorganizing the labor so that the prosecution of the work of digging the ditch contemplated by the contract introduced in this cause, and you are satisfied from the proof that said contract was caused to be breached by the acts and conduct of the plaintiffs in this cause, then you should find for the defendant, Delta Drainage Company.'  That is, if these parties interfered with them in such way, and the proof satisfied your mind, then they are not entitled to recover.  That is a question of fact for you to determine.  You take this case and consider the contract, which will be before you.  You take this declaration that is here and refresh your recollection as best you can

with reference to the testimony of the whole case. You weigh and consider every fact and every circumstance in evidence before you and return your verdict here into court."

Before the jury left the box, the Equitable Surety Company presented in writing to the court a number of special requests, which were each and every one refused by the court, and to which action of the court in refusing to give the special requests so asked, and before the jury retired to consider their verdict, the defendant the Equitable Surety Company then and there excepted to the action of the court.

The first of said requests was that the jury be instructed to find for the Equitable Surety Company. The second and third requests were as follows:

"(2) I charge you, gentlemen of the jury, on behalf of the Equitable Surety Company, that if you believe from the evidence in this case that, at the time of the application for the $5,000 bond, there was submitted along with it to the Equitable Surety Company a draft of the contract, which was afterwards executed by the Muddy Bottom Swamp Land District No. 1 the Delta Drainage Company, and according to the terms of the contract the drainage company was to receive $19,500, when, in truth, the total amount to be paid was $18,000, and this fact was not known to the Equitable Surety Company at the time of the execution of the bond sued on, and that the Delta Drainage Company was to be charged on said contract with $1,500 representing the difference paid for the bonds sold and their par value then, this was a fraud upon the Equitable Surety Company and vitiated the contract sued upon, so far as the Equitable Surety Company is concerned, and you must find for the defendant the Equitable Surety Company.

"(3) I charge you, gentlemen of the jury, that if you believe from the evidence in this case that the commissioners of the Muddy Bottom Swamp Land District No. 1 advanced to the Delta Drainage Company $4,500 as a part of the contract price for completing its work before that amount of work had been actually done and completed, and for the purpose of enabling the Delta Drainage Company to purchase a dredge machine, with which to dig the ditch, without the consent of the Equitable Surety Company first had and obtained, then such action on behalf of the drainage commissioners was without authority of law and in violation of the contract made with the Delta Drainage Company, and releases the Equitable Surety Company from further liability on its bond, and it is your duty to find a verdict for the Equitable Surety Company."

The fifth request to charge made by the Equitable Surety Company was along the same line as the third request, but stated the matter in a different way, as will be seen by the request, which is as follows:

"(5) I further charge you, gentlemen of the jury, that if you believe from the evidence in this case that the commissioners of the Muddy Bottom Swamp Land District No. 1 advanced the Delta Drainage Company $7,361.71, or any other amount, as a part of the contract price for work done under the contract with the Delta Drainage Company before a sufficient amount of said work had been done and completed to warrant and justify the payment of the said $7,361.71, or any part of the same, then the Equitable Surety Company is released from all liability under its bond, and the jury must find for the Equitable Surety Company."

The seventh request to charge was to submit to the jury the question of the liability of the surety company on the second bond for $2,500. This charge is as follows:

"(7) I further charge you, gentlemen of the jury, that if you believe from the evidence in this case that the facts set forth in the application for the

$2,500 bond, and filed with the Equitable Surety Company, were suggested by Commissioner W. L. McBride, and further that this bond for $2,500 was intended to cover money which had already been advanced, and not for the purpose of carrying out the faithful performance of the contract made, by the Delta Drainage Company with the said commissioners, and that the Equitable Surety Company had no notice of such purpose and was not informed as to the facts, then such action amounted to a fraud upon the Equitable Surety Company, and it is the duty of the jury to find in favor of the Equitable Surety Company on the $2,500 bond."

There are three questions thus presented upon which the surety company requested instructions from the court to the jury. The first we wish to mention, although not considering them in the same order in which the requests were made, relates to the advancement by the commissioners to the drainage company of $4,500 at the time that it was advanced, and whether or not this was in accordance with the contract.

[1, 2] The contention for the surety company is that the terms of the contract between the commissioners and the drainage company was that payments should be made to the drainage company as the work progressed, and that the contract gave them authority to decline to honor any requisitions which were not made in this way; that is, to pay for work as it was done. This construction of the contract is our construction, that is, that the commissioners were only to pay for work as it was done and not otherwise, and the surety company had a right to rely upon this as an important provision of the contract. If the commissioners departed from the terms of the contract, and paid to the drainage company money in advance of the time that it could be required or reasonably expected under the terms of the contract, the surety company, it seems to us, was entitled to the third charge above referred to and unquestionably to the fifth charge, which left to the jury the question of whether a sufficient amount of work had been done under the contract to justify the payment.

There was evidence tending to show, without stating it more strongly, that the representative of the surety company was furnished with a draft of the proposed contract between the commissioners and the drainage company before the surety company executed the first bond for $5,000. The testimony in the case shows that this draft of the contract furnished to the surety company's representative who issued the surety bond was substantially the contract afterwards entered into, and that, while there were a few minor changes, there was no important difference between the draft furnished to the representative of the surety company and that finally executed between the parties. C. B. Bright, one of the members of the Delta Drainage Company firm, in his testimony, said this:

"Q. Who did you meet in connection with it before you made the contract? A. Mr. W. L. McBride, W. E. Pegram, and W. Y. Brumley, commissioners of the Swamp Land District.

"Q. Is this the same contract exhibited here? A. Yes, sir; I saw it at the time I signed it.

"Q. Have you seen it here? A. Yes, sir—I have not examined it.

"Q. Before going into that, what was necessary for you and your partner to do with reference to giving bond, etc., before you finally entered into that

contract? A. It was necessary to make application to the bonding company for a bond and also submit a draft of the proposed contract.

"Q. And did you do that? A. We did. * * *

"Q. After you had submitted the contract, or rather the skeleton of it, was it all finished at this time? Was the contract finished at this time? A. Yes, sir; it was finished.

"Q. When? A. On February 10, 1912, I believe it was.

"Q. And did you execute the bond at that time? A. The bond was executed previously to that, in January some time, two or three weeks previous to that time.

"Q. You mean signed up? A. Yes, sir; it was signed before that date. I don't just know what date it was, but just before that.

"Q. You mean the bond of the Equitable Surety Company? A. Yes, sir.

"Q. When did you deliver the bond to the commissioners? A. I believe I took the bond with me to Ripley and delivered it to Mr. McBride on that trip as well as I remember.

"Q. Did the surety company have a skeleton of the contract before they made that bond? A. It is my impression they did.

"Q. Do you know whether they did or not? A. Mr. Pegram sent a draft of it to them—I mean the attorney, and the contract which we signed was practically the same thing; there were some small changes, I think.

"Q. You say they had a skeleton contract? A. Yes, sir; it was made out prior to that time, for I remember I submitted the draft of it to the agent, J. J. Morrison, of the bonding company, at the time I made application for the bond.

"Q. You say you submitted a draft of what the contract would be, the proposed contract? A. Yes, sir."

While the testimony of Pegram was not entirely in accord with that of Bright, there was certainly enough in Bright's testimony to have justified the court in submitting the matter to the jury as requested in the special request for instructions which has been referred to, relative to the manner in which payments were to be made by the commissioners to the drainage company.

[3] Coming to the request with reference to what is claimed to be a misrepresentation as to the contract price, we deem this one of the most material matters as to which a request was made. To represent to the surety company that they were to receive $19,500, when, as a matter of fact, they were to receive only $18,000, if the representation was made at the instance or with the knowledge of the drainage commissioners, would certainly be such a serious misrepresentation as would have authorized the court to submit to the jury the question as to whether that increased the hazard and risk of the surety company to the extent that it relieved it from liability on the bond. The application for the bond undoubtedly stated $19,500 as the contract price, and the contract between the commissioners and the drainage company stated $19,500 to be the contract price, and the evidence that this contract, or a draft of it, was shown to the surety company, is as has been stated. We think the surety company was clearly entitled to the charge requested on this subject.

[4] The next question in the case is the liability of the Equitable Surety Company on the $2,500 bond, and that question is based on the fact that in the application for the bond it was represented to the surety company, quoting from the application, that it was for "additional excavating on drainage canal," when as a matter of fact the whole testimony in the case shows that this bond was required of the

drainage company to secure the commissioners against money which they had advanced. In his testimony C. B. Bright says that the above language, to the effect that the new bond was to cover additional work, was put in the application at the request of McBride, one of the commissioners and one of the plaintiffs in this case. This is nowhere denied, so far as we can see, by McBride or any one else. McBride's testimony with reference to this $2,500 bond is as follows:

"Q. What was the occasion of the second bond that you required of the Equitable Surety Co.? A. It was for equipment that the Delta Drainage Company had to have for the work on the ditch; on the right of way of the canal.

"Q. What did this equipment consist of? A. Dredge boat, engine, boiler; all necessary equipment for the excavation of the canal. * * *

"Q. You had two contracts with this company? A. We had an additional bond, but one contract.

"Q. You made a second bond? A. They owed us more money than the bond came to, and we had paid this money out according to the contract. The machinery was being repaired, and we had to have more repairs, and we asked an additional bond of $2,500.

"Q. What time was it made? A. I suppose it was in May. * * *

"Q. When you got this second bond of $2,500, your first bond was January 15, 1912, there was nothing in your contract about the $1,500 these parties claimed you were charging them on the bond sale? A. No, sir; nothing in the contract.

"Q. The last bond you required them to give? A. We required an additional bond.

"Q. For additional work? A. No additional work.

"Q. What was it for? A. To better secure the commissioners.

"Q. They had breached their contract up to that time? A. No, sir; but they had taken up as much or more money as the first bond, and we required an additional bond.

"Q. The $5,000 bond didn't provide for advancing them money? A. We didn't advance any money except according to the contract. The additional bond was as the first one, to secure the commissioners. No additional work was to be done. * * *

"Q. So when you required this additional bond of $2,500 on May 20th, there had never been anything done on cutting the ditch? A. No, sir. Mr. Skinner was the first man who tried to run it, who tried to operate the machinery up to May 25th, about the time of the completion of the right of way. He tried to operate, but failed.

"Q. He tried to operate but failed? A. Yes, sir. * * *

"Q. Then you required this second bond, not for the faithful performance of the contract, but to guarantee you against loss of money advanced before the work commenced? A. It was for the faithful performance of the contract the money that was advanced before the dirt was moved was according to the contract, and then we required an additional bond for $2,500 at this time—

"Q. You said it was before the work was started— A. It was for the purpose of carrying out the contract.

"Q. You advanced the money before the work was done? A. Before the dirt was moved."

The authorities on the question of increased hazard to surety companies above that stipulated for in the contract as to which they guarantee faithful performance, when caused by, or with the knowledge and consent of, the party insured, and also as to misrepresentations as to the character of the contract which is to be insured, are abundant. Mentioning just a few of these authorities, as to the former, see Shel-

ton v. American Surety Co. (C. C.) 127 Fed. 736, affirmed 131 Fed. 210, 66 C. C. A. 94; Fidelity & Deposit Co. v. Agnew, 152 Fed. 955, 82 C. C. A. 103; Prairie States Bank v. United States, 164 U. S. 227, 17 Sup. Ct. 142, 41 L. Ed. 412. And, as to the latter, Brandt on Suretyship, § 447; 5 Cyc. p. 744.

Other questions are made in this case which we think it is unnecessary to discuss because of what we have already said. There is a question as to whether the surety company received notice, as it should have done, of the failure of the Delta Drainage Company to proceed properly with the work in carrying out the contract, and also as to the rights of the drainage commissioners to sue; but these need not be determined for the reason that the judgment of the District Court must be reversed and a new trial granted for the reasons we have already given.

Reversed, with direction to the District Court to grant a new trial.

WALKER, Circuit Judge, dissenting.