## HALL v. UNION INDEMNITY CO.
### No. 9393.

Circuit Court of Appeals, Eighth Circuit.
Aug. 20, 1932.

Rehearing Denied Sept. 26, 1932.

, Boyle G. Clark, of Columbia, Mo. (James E. Boggs, Nick T. Cave, and Paul M. Peterson, all of Columbia, Mo., on the brief), for appellant.

Clay C. Rogers, of Kansas City, Mo. (O. C. Mosman and Paul A. Buzard, both of Kansas City, Mo., on the brief), for appellee.

Before GARDNER, SANBORN, and BOOTH, Circuit Judges.

SANBORN, Circuit Judge.

Thomas C. Hall was plaintiff in the court below, and Union Indemnity Company was defendant. They will be so designated in this opinion.

The plaintiff entered into a contract in March, 1927, with the Moore & Morris Building Company, as contractor, for the construction of a theater building at Columbia, Mo. The contract price was $24,980. The defendant, which was licensed under the laws of Missouri, through its agent and attorney in fact, Edgar J. Stern, by a bond insured the faithful performance of this contract. The contractor defaulted, and the plaintiff, in order to complete the building and pay off mechanics' liens, was obliged to pay out some $13,000 more than the contract price. He demanded payment from the defendant, which denied liability on the ground that progress payments had been made by the plaintiff to the contractor otherwise than as authorized by the contract. The plaintiff sued the defendant for his damages and the penalty and attorneys' fees allowed by the statute for vexatious delay. The defendant set up in defense the failure of the plaintiff to comply with the contract in making payments to the contractor during the progress of the work. The plaintiff denied that there was any such

failure, but alleged that if there was, the defendant was estopped to assert it.

The parties waived a jury and stipulated for a reference in conformity with the statutes of Missouri. The special master appointed by the court filed a very complete and fair report, stating his findings and conclusions and recommending a judgment for the defendant. Exceptions were taken, the court confirmed the report and ordered judgment for the defendant, and the plaintiff appealed.

As stated by the special master, there were two main issues in the case: (1) Did the plaintiff himself comply with the terms of the building contract, and, if not, did this breach of the contract release the surety? (2) If the plaintiff failed to comply with the terms of the building contract so as to release the surety, did the defendant waive the breach on the part of the plaintiff, and was it estopped to urge such breach?

Article IX of the contract provided: "Payments will be made on all contracts and sub-contracts at the end of each thirty days, upon invoices presented by the Contractor and approved by the Architects, in the sum of Eighty-five per cent (85%) of all materials delivered and paid for and work incorporated in the building."

The plans and specifications, which by reference are made a part of the contract, provided:

"Payments will be made on all contracts and subcontracts at the end of each thirty days upon estimates furnished by the superintendent or the engineer in charge, in the sum of Eighty-five per cent (85%) of all material delivered and paid for and work incorporated in the building.

"These estimates shall be based on the quantity prices as herein provided, and upon invoices presented by the contractor. The balance of fifteen per cent (15%) is to (be) paid when all the work is completed as provided by contract, these specifications, and the accompanying drawings."

The architects employed by the plaintiff, and who prepared the plans, specifications, and contract, were Boller Brothers.

The special master and the court determined that the language of the contract and the plans and specifications above set forth provided for two separate documents to be furnished before the owner was justified in making progress payments—an invoice by the contractor and a certificate or estimate by the architect—and found that no "invoices," as that term is commonly understood, were ever delivered by the contractor to the architect.

There is no dispute in the evidence as to what was done with respect to payments. The contractor presented to the architect, from time to time, statements of labor and material entitled "estimates," which were approved by the architect and presented to and paid by the plaintiff. They did not upon their face purport to be statements that the labor and material referred to had actually been incorporated in the building and had been paid for. The fact that they were called "estimates" would not be of any importance if they were in fact invoices, but there is nothing in the evidence to indicate that they were anything more than what they purported to be—a mere approximation in round figures by the contractor of the value of labor and material which might reasonably be thought to have been incorporated in the building during the progress of the work, but with little, if any, regard to what had actually been incorporated and paid for. Nowhere in the evidence are these statements referred to as anything else but "estimates."

It is not necessary to attempt accurately to define the word "invoice." It is not contended that it is synonymous with "estimate." An invoice calls for a statement of fact, while an estimate calls for an opinion or approximation. Under the terms of this contract, we think that it was intended that before the architect should issue a certificate or estimate calling for a payment, he should have before him at least a statement from the contractor that he had incorporated in this building the items of labor and material of the quantity and value referred to in the statement, and that they had been paid for. So far as the plaintiff was concerned, he, or his architect, might well have insisted that the contractor present detailed invoices for labor and material paid for and incorporated to the architect before making payments, but the defendant is in a position to insist only upon the minimum requirements. It is suggested, however, that the construction placed upon the contract by the parties themselves should lead us to the conclusion that what was done constituted a substantial compliance with its terms. If there was doubt as to whether the contract called for estimates or invoices, there would be merit in this contention; but there is no doubt. The word "invoices" excluded "estimates," and the failure of the plaintiff and the architect to require the contractor to comply with the terms of the contract with

respect to payments cannot in any way bind the surety.

This court would not be justified in disturbing the finding of the special master, concurred in by the court below, that, in making payments during the progress of the work, the architect and the plaintiff did not comply with the provisions of the contract; that substantial amounts to which the contractor was not entitled had been paid; and that the noncompliance with the contract was in this regard prejudicial to the defendant.

■ We are also in accord with the conclusion of the special master that the failure to observe these provisions with respect to payments had the effect of releasing the surety unless the surety is estopped to assert such failure. It is settled that such provisions in a contract are as much for the protection of the surety as of the owner. U. S. Fidelity & Guaranty Co. v. U. S., 191 U. S. 416, 425, 24 S. Ct. 142, 48 L. Ed. 242; Prairie State Nat. Bank v. United States, 164 U. S. 227, 17 S. Ct. 142, 41 L. Ed. 412; Equitable Surety Co. v. Board of Commissioners, 231 F. 33 (C. C. A. 5th); Shelton v. American Surety Co. of N. Y., 131 F. 210 (C. C. A. 3d).

■ The risk assumed by the defendant must be measured by the terms of the contract, the faithful performance of which it guaranteed. Presumably, at least, the compensation of a surety is proportionate to the risk assumed. The defendant had a right to rely upon the carrying out of the terms of the contract with respect to payments. The waiver by the plaintiff of provisions which materially increased the hazard, by permitting the contractor to receive funds to which he was not entitled, as the work progressed, would be the equivalent of substituting a different risk than the one insured against. It is quite apparent that to guarantee the performance of a contract where progress payments are adequately safeguarded is a less hazardous risk than to guarantee the performance of a contract where there are no safeguards.

■ It is suggested that, under the terms of the contract, the architect is not the agent of the plaintiff; that the plaintiff was justified in making the payments as he did; and that the surety is in no position to complain. We think there is no merit in this contention. It is not a case where the architect negligently performed his duty in complying with the contract and presented to the plaintiff an inaccurate certificate or estimate, but a case where the architect waived a provision of the contract which was for the plaintiff's benefit and that of the surety, and modified the contract accordingly. The architect had no power to change or modify the terms of the contract without the consent of the surety so as to bind it, and, in failing to insist upon a complete performance by the contractor of the conditions relative to payment, he must be deemed to be the agent of the plaintiff, who employed him and placed him in charge of the work. The approval by the architect of the contractor's estimates did not prevent the defendant from claiming a breach of the contract, since the contract did not provide that the architect's determination should be final. Mercantile Trust Co. v. Hensey, 205 U. S. 298, 307, 27 S. Ct. 535, 538, 51 L. Ed. 811, 10 Ann. Cas. 572; United States v. Hurley, 182 F. 776 (C. C. A. 8th); United States v. A. Bentley & Sons Co., 293 F. 229, 245 (D. C. S. D. Ohio).

With reference to the question of waiver or estoppel, the facts are briefly these: The bond in question here was executed for the defendant by Edgar J. Stern, agent and attorney in fact. At that time, the firm of Stern, Sachs & Company, a copartnership of which Edgar J. Stern was a member, was the general agent of the defendant at Kansas City, Mo., for the purpose of writing surety bonds. Stern was also its attorney in fact with authority to execute bonds. In March, 1927, the defendant filed a requisition with the State Insurance Department of Missouri, certifying that it had appointed "Stern, Sachs & Company (E. J. Stern—L. E. Stern—H. L. Sachs) of Kansas City, Missouri, agent for the transaction of its authorized business of insurance in the State of Missouri for the term ending March 1, 1928." On March 28, 1927, pursuant to this requisition, the superintendent of insurance licensed Stern, Sachs & Company as agent for the defendant in the state until March 1, 1928, "unless sooner revoked by said company." On June 10, 1927, the defendant wrote Stern, Sachs & Co., "Attention Mr. Edgar J. Stern," as follows: "Kindly accept this letter as the Union Indemnity Company's notification of the termination of your general agency contract effective at the expiration of thirty (30) days from your receipt of it, this being in accordance with the terms of the said general agency agreement, and as the revocation at the time of said receipt of your Powers of Attorney for the execution of bonds in its behalf."

On July 13, 1927, the defendant wrote Stern, Sachs & Co., "Attention Mr. Edgar Stern," advising him that the thirty-day period had elapsed, and that his power of at-

torney was revoked. Shortly before July 13th, the defendant appointed the firm of Thos. McGee & Sons as its general agents at Kansas City, and notice of that appointment was published in the Kansas City Star, the Kansas City Post, and one or two other newspapers published at Kansas City, Mo. The plaintiff had no actual notice or knowledge of the revocation of the agency of Stern, Sachs & Co. No notice of the revocation was filed with the state insurance department. On August 3, 1927, some twenty days after the revocation of the agency of Stern, Sachs & Co., the architect wrote the contractor complaining of the progress of the work, and complaining that the contractor was not paying bills for materials. A copy of this letter was sent to Stern, Sachs & Co. On August 19, 1927, the architect wrote the contractor that work on the building had practically ceased, and that, unless the contractor got on the job within three days, the plaintiff would take over the work and complete it himself in accordance with the provisions of the contract. A copy of this letter was sent to Stern, Sachs & Co.

The special master in his report finds:

"During all of this time there is no claim that Stern notified Hall or the architect or any of the witnesses for plaintiff, that he (Stern) was no longer the agent of the defendant or that his agency had been revoked.

"On the contrary, Stern came to Columbia on August 6th and Larkin, one of the subcontractors, talked to him. Larkin testified that Stern stated he was representing the bonding company. Larkin further testified that he was in Kansas City about August 16th, and that he called upon Stern; that Stern asked him about the job at Columbia, and the payment of bills by the contractor; that Stern gave him a copy of his account with the contractor and made up such copy from the books of the Moore & Morris Building Company which were then in the possession of Stern.

"On August 22nd, Mr. Moore, of the Moore & Morris Building Company, came to Columbia in response to the letter of the architect dated August 19th; Moore brought with him a Mr. Graham who was to represent the contractor in completing the building. Moore admits that he told Hall, that Hall would have to pay the salary of Graham. Moore testified, however, that Stern did not go to Columbia with him on August 22nd, and that he did not see Stern there that day.

"Graham, the new superintendent, testified that he saw Stern in Columbia that day and that Stern requested him to make, and that he did make to Stern, a report of the situation at Columbia. His report was identified as Exhibit 198.

"The evidence is, therefore, clear to the effect that after the agency of Stern had been revoked, he made at least two and possibly three trips to Columbia, Missouri, where the theatre building was being constructed. Stern admits that he was in Columbia, Missouri, on August 6th and again on August 25th. He denies that he was in Columbia, Missouri, on August 22nd, and is supported in his denial by other witnesses who claim that he was in Kansas City on that date. The plaintiff and two of his employees who worked on the theatre building, one of the subcontractors on the theatre building, and Mr. Graham, the superintendent of the job on August 22nd, all testified that Stern was in Columbia on August 22nd.

"Stern explained his visit to Columbia on August 6th by saying that he went down there at the request of Mr. Moore of the Moore & Morris Building Company, who was having trouble with Mr. Morris who was associated with him in the Moore & Morris Building Company, and who was and had been until that time in general charge of the work at Columbia. (Mr. Moore corroborated Stern in this explanation.) He explained his visit to Columbia on August 25th by saying that he passed through Columbia with his mother and sister on his way to Chicago for a vacation, and the evidence shows that two women were with him on his last visit to Columbia. He denies that upon any of these visits he stated or represented to the plaintiff or anyone else that he was the agent of the defendant or that he had authority to act for the defendant. On his visit to Columbia on August 6th, he admits that he took back to Kansas City with him, one Paul Clark, who was bookkeeper for the contractor, and that Clark had with him the books of the Moore & Morris Building Company which were left in the office of Stern at Kansas City.

"The plaintiff, Hall, and two of his employees, testify that on August 22nd, Stern told Hall, the plaintiff, that he (Hall) would have to pay the labor bills from that time on and that he should keep the job moving; that he further told Hall that he should not pay any material bills but should pay all labor bills until the contract price had been exhausted, at which time he should notify one Major Richey, who was the adjuster for the defendant and could be found either at Chillicothe, Missouri, or at the President Hotel in

Kansas City, and that Richey would come and take over the job.

"Graham, who was put in charge of the job as superintendent by the contractor on August 22nd, testified that Stern made substantially the same statements to him prior to August 22nd.

"Although there is a sharp dispute in the testimony as to the presence of Stern in Columbia on August 22nd, it is admitted that he was there on August 25th. The witnesses for plaintiff may be mistaken in fixing the exact dates of the visit of Mr. Stern to Columbia on August 22nd, but the Master finds that Stern did make the statements attributed to him by Hall and his employees on one of these dates, and did lead Hall to believe that he (Stern) was still the agent of the defendant company. The Master finds that Hall believed and relied upon the statements so made by Stern and took over the work and finished the work in accordance with the instructions given to him by Stern. The Master finds further that neither the surety company nor any of its agents nor Stern nor anyone else ever gave Hall any actual notice that Stern was not the agent of the defendant during August, 1927. In this connection, however, the Master finds that neither the surety company nor any of its recognized agents, made any statements or committed any affirmative acts during August, 1927, which might be construed as a holding out of Edgar J. Stern as an agent of the defendant nor did they make any statements or commit any acts tending to ratify any of the statements, acts or conduct of Edgar J. Stern nor is there any evidence that they knew anything about the situation at Columbia at the times Stern was there.

"The evidence shows that one Major T. G. Richey was the adjuster for the defendant company in the Kansas City territory.

"Plaintiff's evidence shows that the first time Richey was notified of any trouble at Columbia by plaintiff, was on August 27th, when the architect, at plaintiff's request, called Richey at Chillicothe, Missouri, by telephone. Richey, however, did not then commit himself in any way. A few days later Richey, however, went to Kansas City presumably to make some investigation of the facts, but he never came to Columbia and made no promises to the plaintiff. He later refused to do anything and on October 11th, 1927, the attorneys for defendant notified plaintiff that the defendant denied all liability on the bond because of plaintiff's violation of the terms of his contract with the Moore & Morris Building Company.

"It is true as alleged by plaintiff that Stern had the books of the Moore & Morris Building Company in his office from August 7th to August 25th and if he had examined them, he might have known what payments had been made by Hall and also by the contractor prior to August 22nd. It is not clear, however, that he then knew or could have learned from an examination of the books of the contractor, that the contractor had never furnished any invoices to the architect showing or tending to show the payment of bills for materials delivered nor is there any evidence that the plaintiff or the contractor ever mailed or delivered any copies of the contractor's 'estimates' to the defendant or to Stern, Sachs & Company.

"Stern by his acts and conduct, both of omission and commission, and by his statements, misled the plaintiff, but the Master finds under all of the facts that the defendant is not bound by such acts and statements of Stern, unless it is estopped to deny them.

"Stern had been an agent for the company prior to July 13, 1927, for the purpose of writing bonds for the defendant, but there is no evidence that he ever had authority or ever exercised the right to adjust claims with the knowledge and approval of the defendant."

The master and the court reached the conclusion that, while the plaintiff had no notice of the revocation of Stern's authority, his conduct with respect to the completion of the work, after notice of default by the contractor, was not binding upon the defendant because the evidence did not indicate that Stern had ever had authority to adjust claims; and that one who deals with a discharged agent must deal with him in a matter within the agent's original authority, before he can urge that the agent's apparent authority continues as to him until he has received notice.

We do not question the principle of law upon which this conclusion is based. If Stern never had actual, implied, or apparent authority to deal with the plaintiff with respect to the liability of the defendant under the bond in case of default, or to waive compliance with the provisions of the contract with respect to progress payments, then it is immaterial what Stern did or said after the revocation of the agency. Stern, however, was the general agent of the company at the time this bond was written. He was the only representative of the company with whom the plaintiff had come in contact; he had written and executed the bond; the public records in the department of insurance would indicate no limitations upon his authority and no sub-

sequent revocation of it, and there was nothing in the contract between the plaintiff and the defendant to indicate any limitation. Since he had general authority to procure business for the company and to write bonds for it, it might reasonably be assumed that he had authority to determine what requirements as to the making of progress payments would be acceptable in connection with a contractor's bond. It might also be reasonably assumed that, when he received notice of a default in the performance of a contract for the faithful performance of which he had written a bond, he had authority to issue instructions as to what course should be pursued for the owner's protection and that of his principal, the surety, and that, after notice of default, he, as agent, would only issue such instructions after being satisfied that his principal was liable or would assume liability. Even if it be assumed that the matter of the final adjustment of losses would not fall within his apparent authority, he might well be thought to have authority to deal with the owner and the contractor for the purpose of minimizing the loss. The apparent authority of a general agent exceeds that of a mere adjuster of losses.

What the plaintiff did after the contractor had defaulted on the work is what any prudent person similarly situated would have done. There was nothing to lead him to investigate the question of Stern's authority, and everything which Stern did and said, as found by the special master, was calculated to confirm the plaintiff in his belief that he was dealing with an authorized general agent of the defendant.

The applicable rule of law is stated in Southern Life Insurance Co.' v. McCain, 96 U. S. 84, 86, 24 L. Ed. 653. The court said:

"No company can be allowed to hold out another as its agent, and then disavow responsibility for his acts. After it has appointed an agent in a particular business, parties dealing with him in that business have a right to rely upon the continuance of his authority, until in some way informed of its revocation. The authorities to this effect are numerous, and will be found cited in the treatises of Paley and Story on Agency.

"The law is equally plain, that special instructions limiting the authority of a general agent, whose powers would otherwise be coextensive with the business intrusted to him, must be communicated to the party with whom he deals, or the principal will be bound to the same extent as though such special instructions were not given. Were the law

otherwise, the door would be open to the commission of gross frauds. Good faith requires that the principal should be held by the acts of one whom he has publicly clothed with apparent authority to bind him."

Because of this rule, it follows that the uncommunicated revocation or limitation of actual authority does not of itself limit or revoke apparent authority. See, also, Johnson v. Christian, 128 U. S. 374, 9 S. Ct. 87, 32 L. Ed. 412; Hatch v. Coddington, 95 U. S. 48, 24 L. Ed. 339; Union Bank & Trust Co. v. Long Pole Lumber Co., 70 W. Va. 558, 74 S. E. 674, 41 L. R. A. (N. S.) 663; Waters-Pierce Oil Co. v. Jackson Junior Zinc Co., 98 Mo. App. 324, 73 S. W. 272; Kilpatrick v. Wiley, 197 Mo. 123, 95 S. W. 213; Georgia Life Ins. Co. v. Otter Creek Coal Co., 67 Ind. App. 277, 119 N. E. 151; Bacon v. Dannenberg Co., 24 Ga. App. 540, 101 S. E. 699; Montana Reservoir & Irrigation Co. v. Utah Junk Co., 64 Utah, 60, 228 P. 201; Keller v. New Jersey Fidelity & Plate Glass Ins. Co., 306 Pa. 124, 159 A. 40.

In each of the six following cases an insurer was held bound by the acts of its former agent within the scope of his apparent authority, but committed after revocation of his actual authority. This was so held upon the grounds of either waiver or estoppel. Continental Fire Ins. Co. v. Brooks, 131 Ala. 614, 30 So. 876; Burlington Ins. Co. v. Threlkeld, 60 Ark. 539, 31 S. W. 265; Gragg v. Home Ins. Co. of New York, 139 Ky. 472, 107 S. W. 321; Sutherland v. Federal Ins. Co., 97 Miss. 345, 52 So. 689; Wilson v. Commercial Union Assurance Co. of London, 51 S. C. 540, 29 S. E. 245, 64 Am. St. Rep. 700; Scott v. Law Union & Rock Ins. Co. (Tex. Com. App.) 12 S.W.(2d) 147. Compare Greenwich Ins. Co. v. Sabotnick, 91 Ga. 717, 17 S. E. 1026; Burlington Ins. Co. v. Campbell & Talbot, 42 Neb. 208, 60 N. W. 599; Haverly v. Westchester Fire Ins. Co., 138 Tenn. 557, 199 S. W. 393.

"The rule as to apparent authority rests essentially on the doctrine of estoppel. The rule is that, where one has reasonably and in good faith been led to believe from the appearance of authority which a principal permits his agent to have, and because of such belief has in good faith dealt with the agent, the principal will not be allowed to deny the agency, to the prejudice of the one so dealing." Columbia Mill Co. v. National Bank of Commerce, 52 Minn. 224, 229, 53 N. W. 1061, 1062.

Stern had no actual authority in August, 1927, to bind the defendant company in

his dealings with the plaintiff with respect to the bond he had written, nor did he have implied authority, since implied authority is actual authority circumstantially proved. Koivisto v. Bankers' & Merchants' Fire Ins. Co., 148 Minn. 255, 181 N. W. 580; Columbia Mill Co. v. National Bank of Commerce, supra; 2 C. J. 435. Stern's actual authority had been revoked, and with it his implied authority, but his apparent authority, so far as the plaintiff was concerned, remained unimpaired.

 The situation then is briefly this: In his dealings with the plaintiff Stern was still, in effect, the general agent of the defendant; the scope of his apparent authority was co-extensive with "the authorized business of the defendant in the State of Missouri," which business included not only the writing of bonds and collection of premiums, but the payment of losses as well. Stern, after notice of default, instructed the plaintiff to complete the contract and pay for labor. The plaintiff in good faith, relying upon the existence of Stern's authority, completed the contract and made the payments suggested, and thus changed his position. The defendant is now estopped to take advantage of the plaintiff's breach of the contract with respect to progress payments.

The conclusion of law of the special master and the court that the acts of Stern were not binding upon the defendant was error.

The judgment is reversed, and the case remanded for further proceedings not inconsistent with this opinion.