## VIRGINIA FERRY CORPORATION v. NATIONAL LABOR RELATIONS BOARD.

### No. 4387.

Circuit Court of Appeals, Fourth Circuit.
Jan. 9, 1939.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

Otto Wolff, Jr., of Philadelphia, Pa. (Lewis, Wolff, Gourlay & Hemphill, of Philadelphia, Pa., on the brief), for petitioner.

Lawrence Hunt, Senior Litigation Atty., National Labor Relations Board, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and Laurence A. Knapp and Mortimer B. Wolf, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

PARKER, Circuit Judge.

This is a proceeding, instituted by a petition to review an order of the National Labor Relations Board, in which the Board has filed answer asking a decree enforcing the order. The petitioner is a ferry company, operating two ferry boats, the Princess Anne and the Del-Mar-Va, across the Chesapeake Bay between Cape Charles and Little Creek in the State of Virginia; and it admits that it is engaged in a business affecting interstate commerce within the meaning of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. The Board absolved it of charges of discriminatory discharge of employees, but found that it had been guilty of unfair labor practices in dominating and interfering with the formation and administration of a committee for collective bargaining in violation of section 8 (2) of the Act, 29 U.S.C.A. § 158(2), and in interfering with, restraining and coercing its employees in violation of section 8 (1) thereof, 29 U.S.C.A. § 158(1). The Board's order directed petitioner to cease and desist from these unfair practices, to withdraw recognition from the committee as an agency of collective bargaining and to post notices that it would cease and desist from the unfair practices and would refrain from all recognition of the committee as a bargaining agency.

The facts as found by the Board are as follows: In the Spring of 1937 the crews of the two ferry boats were dissatisfied with their wages and frequently made complaint to petitioner's superintendent and to Captain Stone, its senior captain. Petitioner was experiencing difficulty in retaining the men in its service; and Captain Stone, the master of the Princess Anne, took up with Captain Daniels, the master of the Del-Mar-Va, the question of forming a committee to negotiate with the management in their behalf. The two captains discussed the matter with the superintendent and, having obtained his approval, they proceeded to obtain the approval of the men to the formation of a committee. The plan as formulated by the captains, with the cooperation of the chief engineers and the pursers, provided for separate representation of the deck crew, the engine room crew and the purser's department of each of the boats. Tickets were then prepared by the pursers upon which only the names of the licensed officers of the vessels appeared although there was a line at the bottom to the effect that the voter could write in any name that he wished. These tickets were distributed among the men; and the election of the captain, the chief engineer and the purser of each boat as members of the bargaining committee resulted. Written approval of the committee so selected was signed by all the members of the crews of both vessels.

Following their election as members of the committee, the officers of the boats conferred with petitioner's superintendent with respect to an increase of wages for officers and men and a change in certain working conditions. An increase of wages of the men from $50 to $65 per month was asked; but the superintendent was willing to allow an increase of only $7.50. This was reported to the men and they were about to strike, but were prevailed upon by the captains to withhold action. An increase to $65 per month was finally agreed to, the wages of the captains and the chief engineers being advanced at the same time to $220 per month and the pursers to $120 per month. About this time a large number of the men joined the International Seamen's Union. When the $65 wage was granted them, all signed instruments approving the wage and working conditions as agreed on.

There is evidence that while the agitation with respect to increase of wages was in progress and membership in the International Seamen's Union was under consideration, Captain Stone called the

men on deck and told them "that he would not work a union crew, before he would do that he would pack his bag and get off." A witness, Hudgins, testified that he heard Captain Stone talking to the crew down in quarters and that he told them that he would rather have them keep out of the union and follow him; that, if they were union men, they would have to work four hours on and have eight off on the ship and no more relief, and that it would not be as friendly as it had been. There is evidence, also, that a short while later, in the course of a speech to the men on the fourth of July, the superintendent warned them not to be fooled by the outsiders, that petitioner had treated them right and was "still going to treat them right". There was denial of these statements by Captain Stone and the superintendent; and there was evidence on the part of petitioner that it had no objection to union membership on the part of the men, that it had done nothing to prevent their joining the union, and that the captain of the Del-Mar-Va and the purser on the Princess Anne were members of the Masters, Mates and Pilots Union.

There was no evidence of power to hire and discharge on the part of the captains, chief engineers and pursers; but there was evidence that men desiring employment with petitioner filed applications with the superintendent and that certain discharges shown to have been made were made by him.

With respect to the alleged domination and interference by petitioner with the formation and administration of the committee as an agency for collective bargaining, the Board summed up its findings as follows: "It is undisputed that (1) the notion of forming the committee originated with Captain Stone, master of the Princess Anne, (2) that Captain Stone interested and secured the assistance of Captain Daniels, master of the Del-Mar-Va and a number of other officers in perfecting this notion, and (3) that these men formed the committee only after securing the approval of the respondent's general superintendent. Since the committee was to represent the stewards and the unlicensed seamen as well as the officers, there can be no doubt that Captains Stone and Daniels were acting as supervisory employees and as agents of the respondent. When the I. S. U. began organizing the employees Stone joined with the respond-

ent's general superintendent in discouraging membership in the I. S. U. by making anti-union statements as found below."

With respect to the restraint and coercion charge, the Board's finding was: "We find that the respondent, by the anti-union speeches of its general superintendent and senior captain, has interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in section 7 of the Act [29 U.S.C.A. § 157]."

We think that both findings of the Board should be sustained. Not only does it appear that the bargaining committee was organized by the chief officers of the two vessels on their own motion with the approval of petitioner's superintendent, but it also appears that the persons selected as members of the bargaining committee were these same chief officers, whose duty it was to represent petitioner in dealing with the men under them. One of the chief purposes of the National Labor Relations Act is to insure that the bargaining agency of employees shall be free of domination or influence by their employer so that in bargaining it shall represent their interest with singleness of mind; and this purpose would be entirely nullified if representatives of the employees should be chosen from among their superior officers, whose interest and duty it is to protect the interest of the employer. We are told on high authority that "no man can serve two masters". It makes no difference that the men voted for their officers to represent them; for no election can be held to represent their free choice where the candidates chosen are vested with such complete authority over them. That such a committee, dominated as it would necessarily be by the wishes of the employer, is not an appropriate agency for representing the employees for the purpose of collective bargaining, would seem to be self evident. Cf. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Pacific Greyhound Lines, 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838. The employer cannot be permitted, directly or indirectly, to sit on both sides of the bargaining table.

Likewise we think that the Board was correct in its holding with respect to the responsibility of the employer for the statements of Captain Stone. The mere

fact that it was not shown that the captain had authority to hire and discharge is immaterial. He was the employer's representative in the navigation of the vessel of which he was in command, charged with the duty of maintaining discipline among officers and crew; and it is inconceivable that his recommendations with respect to discharge would not have been followed. Irrespective of this, however, his relationship to the owner was such that the doctrine respondeat superior unquestionably applies. Cf. National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951, 956. And there can be no question as to the purport of the remarks which the Board found that he made. To say that he was merely giving notice that he would leave the ship if the crew joined the union, as argued by petitioner, is not persuasive. He was expressing, in most unmistakable terms, his hostility to the union and his unwillingness to have union men serve under him. There can be no question, of course, as to petitioner's responsibility for the statements of its superintendent, which the Board has found upon substantial evidence were intended as a warning against joining an outside union.

 The order of the Board requires the posting of a notice by petitioner that it will cease and desist from the unfair labor practices forbidden by the order. As pointed out in National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951, 958, 959, this is to require a written confession by petitioner that it has been guilty of the unfair practices charged; and we there held that the requirement of such a confession is not a proper provision of an order the violation of which may result in a punishment for contempt of court. The purposes of the Act will be fully met if petitioner is required to post a notice to its employees which contains a copy of the order of the Board, together with a statement that the order has been approved by this Court and is binding upon petitioner and that petitioner will abide by and comply with it. See, also, National Labor Relations Board v. Eagle Mfg. Co., 4 Cir., 99 F.2d 930. A copy of such order should be posted on each of petitioner's boats and docks.

A decree will be entered modifying the order as above indicated and directing that as modified it be enforced.