**CUPPLES CO. MANUFACTURERS v. NATIONAL LABOR RELATIONS BOARD (MUTUAL RELATIONS ASS'N, Intervener).**

**No. 426, Original.**

Circuit Court of Appeals, Eighth Circuit.

Aug. 1, 1939.

Rehearing Denied Sept. 12, 1939.

WOODROUGH, Circuit Judge, dissenting in part.

Luther Ely Smith, Jr., and Victor B. Harris, both of St. Louis, Mo. (Luther Ely Smith, of St. Louis, Mo., on the brief), for petitioner.

Malcolm F. Halliday, of Washington, D. C., Atty., National Labor Relations Board (Charles Fahy, Gen. Counsel, National Labor Relations Board, Robert B. Watts, Associate Gen. Counsel, National Labor Relations Board, and Mortimer B. Wolf, Allen Heald, Richard C. Barrett, and Norman F. Edmonds, all of Washington, D. C., Attys., National Labor Relations Board, on the brief), for respondent.

Wilder Lucas, of St. Louis, Mo., for intervener.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

SANBORN, Circuit Judge.

This case comes to this Court upon a petition of Cupples Company Manufacturers, a Missouri corporation, to review and set aside an order of the National Labor Relations Board entered December 5, 1938, and upon the answer of the Board praying that its order be enforced.

On August 3, 1937, Matchworkers' Federal Labor Union No. 20,927, and International Association of Machinists, District No. 9, filed petitions with the Regional Director of the Board for the Region including St. Louis, Missouri, alleging that a question had arisen concerning the representation, for purposes of collective bargaining, of employees of the Cupples Company Manufacturers (hereinafter referred to as the Company or as petitioner) and requesting an investigation and certification pursuant to Section 9(c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C. §§ 151–166. Charges having also been filed with the Board by the Matchworkers' Union above referred to, alleging that the petitioner had engaged and was engaging in unfair labor practices affecting commerce within the meaning of Section 8(1), (2), (3) and (5) and Section 2 (6), and (7) of the same Act, the two representation cases and the case involving the charges of unfair labor practices were consolidated for hearing and were heard as one case before a Trial Examiner appointed by the Board.

The complaint against the petitioner charged: (1) That it had, since June 25, 1937, fostered, dominated and interfered with the formation and administration of a labor organization formed by a majority of its employees, known as the Mutual Relations Association, and that the petitioner had given financial aid and other support thereto; (2) that on July 14, 1937, the petitioner had laid off or discharged thirteen employees at one of its plants for joining the Matchworkers' Union; (3) that since July 17, 1937, the petitioner ceased the manufacture of penny matches for the reason that some of its employees, engaged in that operation, had assisted the Matchworkers' Union and had become members of it; (4) that the petitioner had

kept under surveillance the meetings of the Matchworkers' Union, and had advised its employees against becoming or remaining members of that Union; and (5) that the petitioner had refused to bargain collectively with the Matchworkers' Union, although it represented a majority of the petitioner's employees within an appropriate unit.

The petitioner, while admitting the jurisdiction of the Board, denied that it had engaged or was engaging in any unfair labor practices, denied that its match department was an appropriate unit for collective bargaining, and asserted that it was without knowledge as to whether a majority of its employees in that department had, prior to July 17, 1937, designated the Matchworkers' Union as their representative for collective bargaining.

The Mutual Relations Association on November 24, 1937, petitioned for leave to intervene with respect to the allegations of the complaint charging that the Company has fostered, dominated or interfered with the formation and administration of the Association. Leave to intervene was granted.

A hearing of the consolidated cases was held before a Trial Examiner commencing November 29, 1937, and ending December 14, 1937. The Board, the petitioner, the intervener, and the Machinists' Union were represented by counsel and participated in the hearing. At the hearing the Mutual Relations Association was also granted leave to intervene with respect to the allegation of the complaint that production and maintenance employees of the match department of the petitioner constituted an appropriate unit for collective bargaining, but it was denied such leave with respect to the allegation that a majority of the employees in that unit had designated the Matchworkers' Union as their bargaining representative. During the hearing, the Board was permitted to amend its complaint by alleging that the petitioner had discharged Daisy Whiteman in order to discourage membership in the Matchworkers' Union.

At the conclusion of the Board's case, the petitioner and the intervener moved for a dismissal of the complaint. The Examiner dismissed the allegation that a majority of the employees in an appropriate unit had designated the Matchworkers' Union as their representative, but otherwise denied the motions.

The Trial Examiner on February 7, 1938, filed his Intermediate Report, in which he found that the petitioner had engaged and was engaging in unfair labor practices within the meaning of Section 8 (1), (2) and (3) and Section 2(6) and (7) of the Act. He recommended that the petitioner be ordered to cease and desist from such unfair labor practices, to refrain from dealing with or recognizing the Mutual Relations Association as the representative of its employees, to disestablish that Association as such representative, to offer immediate and full reinstatement to the employees found by the Trial Examiner to have been discriminatorily discharged, and to make whole such discharged employees for losses of pay suffered by them from the time of their discharge to August 17, 1937. The petitioner and the Mutual Relations Association filed exceptions to the report of the Trial Examiner, and the case was argued before and submitted to the Board.

The Board sustained the report of the Trial Examiner. It found that the petitioner had dominated, interfered with, and contributed to the support of, the Mutual Relations Association. It found that the Company had discriminatorily discharged eleven of its employees. It ordered the Company to disestablish the Mutual Relations Association as a bargaining agency for its employees; to give no effect to the contract which it had entered into with the Association; to offer to the discharged employees full reinstatement; to make them whole for loss of pay; and to place those of them for whom no employment was available or could be made available, upon a preferential list.

With respect to the question of representation, the Board found that the employees of the petitioner in its match department, with certain exceptions, constitute an appropriate bargaining unit. The Board said: "The only organization which has organized the employees of the respondent [Cupples Company] on an industrial basis for the purposes of collective bargaining we have found to be supported and dominated by the respondent. The Matchworkers' Union has organized only the employees of the match department. These employees should not under the facts presented be denied the benefits of the Act, merely because the other employees of the Company are not organized." The Board found, however, that the six machinists, belonging to the Machinists' Union, who sought recognition as a bargaining unit should not be established as such.

The Board determined that an election by secret ballot should be held in the match department to determine whether the employees in that department wish to be represented by the Matchworkers' Union. No time for holding the election was set, and, so far as we are advised, no election has been held and no representative for the employees in that department has been chosen or certified.

There are no questions growing out of the representation cases now before us for review, for the reason that the Board has made no final order with respect to representation in the match department. We have already so ruled in disposing of a motion of the petitioner for a commission to take depositions of members of the Board and others. See Cupples Company Manufacturers v. National Labor Relations Board, 8 Cir., 103 F.2d 953.

The questions which we are called upon to determine are:

1. Was the hearing before the Trial Examiner so unfair as to constitute a denial of due process?

2. Is the finding of the Board that the formation and administration of the Mutual Relations Association was fostered, interfered with and dominated by the petitioner, and that it received support from the petitioner, sustained by substantial evidence?

3. Is the Board's finding that the petitioner discharged eleven of its employees for joining or assisting the Matchworkers' Union supported by substantial evidence?

The evidence is contained in a typewritten transcript of approximately 3,000 pages. It is manifestly impractical to include a complete detailed synopsis of the evidence in this opinion or to state every fact, established by the evidence, which is regarded as significant by each interested party. We shall attempt to make a fair statement of what we consider to be the important facts disclosed by the evidence, keeping in mind that, while the burden of proof was upon the Board, it is entitled to have the evidence and all reasonable inferences which may be drawn therefrom viewed in the light most favorable to its conclusions; that questions involving the weight of evidence and the credibility of witnesses were for it to de-

termine, but that evidence which merely furnishes grounds for suspicion and conjecture proves nothing, and that the Board, like a jury, may not disregard the uncontradicted testimony of unimpeached and credible witnesses.[1]

The petitioner, a Missouri corporation, located in St. Louis, Missouri, has been in business since 1851. It has been engaged in selling products to the wholesale trade throughout the United States. Eighty per cent of its business is merchandising; twenty per cent is manufacturing products in which it deals. It is presently manufacturing mops, mop heads, rubber heels, fruit jar rings, inner tubes, and matches. It employs about 550 persons, of whom approximately 400 are engaged in manufacturing. It has two plants in St. Louis, one at 601 Spruce Street, called the Sixth Street Plant, and one at 101 West Cornelia Street, called the North Main Street Plant. In these plants its manufacturing operations are conducted. It has, in addition, a warehouse and General Offices at 401 South Seventh Street, St. Louis.

The Company is governed by a Board of Directors, consisting of H. B. Wallace, president, Harold Maxwell, vice-president and general manager, John K. Wallace (a son of H. B. Wallace) vice-president, George A. Cope, vice-president, Homer Klein, vice-president, L. A. Benecke, vice-president, W. A. Backer, treasurer, and Jesse McDonald and Henry McRee. The seven officer-directors of the Company are actively engaged in its business. Its active management is headed by H. B. Wallace.

Edward H. Bohlman is in charge of the manufacturing operations of the Company. His immediate superior is H. B. Wallace. His immediate subordinate in the match department, at all times which are here material, was a Mr. Weaver, who was the manager of that department. L. J. Mayhew is superintendent of the match department and was directly under Mr. Weaver. Next below Mayhew are three foremen, and under them the employees engaged in the production of matches. The match department of the Company is located in the North Main Street Plant, on the first floor of which Mr. Mayhew has his office.

Until the difficulties out of which these proceedings before the Board arose, the Company had been on good terms with its employees, some of whom had been constantly in its employ for many years. It had endeavored to operate its manufacturing units in such a way as to furnish employment throughout the year, and when it became necessary to shut down any unit it furnished to the employees of that unit other employment so far as possible. In 1917, at the instigation of H. B. Wallace, a profit-sharing plan was voluntarily established by the Company and has been continued from year to year. It is known as the Loyalty and Service Club, the object of which is to enable the employees to participate in the profits of the Company upon the basis of their efficiency. Membership in the club has been restricted to employees of the Company who are not officers and who have been with the Company for one year or more. Members are elected to membership by a designated class of members of the Association and are graded for efficiency. The grades are 1, 2, 3, 4 and 5 bars. A 1-bar membership is regarded as the equivalent of the ownership of $200 of the common stock of the Company, a 2-bar membership as the equivalent of $400 of common stock, 3-bar $600, 4-bar $800, and 5-bar $1,000. Upon a distribution of surplus by the Company, the members of the club receive the same dividends which they would receive if they owned the amount of stock which is allocated to their memberships. In distribution of earnings, an aggregate of twenty per cent goes to the members of the club. The Company also provides each member of the club with life insurance protection based upon his grade of membership,—a 1-bar member $600, 2-bar $700, 3-bar $800, 4-bar $900, and 5-bar $1,000. The Company operates a cafeteria for the members of the club. The management of the club is in the hands of the 5-bar members, but a veto power upon their action is reserved to a council composed of officers of the Company. The original 5-bar members were selected by H. B. Wallace. The 5-bar members grade the employees elected by them to membership according to their efficiency as determined by the 5-bar members. Upon election to membership, a

---

[1] The testimony of a witness not shaken on cross-examination and not contradicted by any witness, fact or circumstance, must be accepted as true. Woodward v. Chicago, M. & St. P. Ry. Co., 8 Cir., 145 F. 577, 582.

member is given a 1-bar rating. He may subsequently be advanced at any meeting of the 5-bar members, subject to the power of the council to veto. Ninety-five to ninety-seven per cent of the Company's employees are members of this club. The President of the Company has a list of all club members and their individual ratings. The employees in the match department were not members of the club, having been in the employ of the Company less than one year.

For many years, the Company had dealt in matches. In 1935 it found itself without a satisfactory source of supply and decided to manufacture its own matches. In the summer of 1935 it commenced the manufacture of suitable match-making machinery. By the summer of 1936, three match-making machines had been completed and placed in the North Main Street Plant. These machines were adapted to the making of large matches called "nickel matches" (matches selling for five cents a box). One of the machines was so located that it could be changed over and used for making small or penny matches and safety matches. L. J. Mayhew, an experienced match maker, of Wheeling, West Virginia, was employed to superintend the manufacture of matches. He hired all the employees in his department and was in charge of them, but certain mechanics and maintenance men attached to the department were under Joe Kountzelman, a maintenance foreman. The match department is divided into four branches: (1) composition, (2) box, (3) manufacturing, and (4) shipping. The match machines occupy a portion of the basement and extend above and through the first floor of the building. In September, 1936, the three machines were in operation, producing nickel matches. The Company then commenced making parts to enable it to convert one of the machines into a machine which would produce penny matches. In March, 1937, one machine was changed over. The manufacture of penny matches on this machine necessitated the employment of 30 to 35 inexperienced girls. Mr. Mayhew hired these girls over a period of time. The first of them were employed on March 9, 1937. The last group were employed in June, 1937. The girls were placed under the immediate supervision of Irene Weitzel, who was an experienced match machine operator whom Mayhew brought from West Virginia for the purpose of training the new

employees in the match department. In March, 1937, she was working as an employee on a nickel match machine at an hourly wage of forty cents. When the penny match machine was started, she was assigned to the work of instructing the new employees and supervising the production of this unit. In the course of her employment Miss Weitzel instructed the employees working on the penny match machine, transmitted the orders from Mayhew, her immediate superior, to these employees, shifted the position of the girls on the machine in the interests of efficiency, and relieved the girls for brief intervals. She had authority to recommend employment or discharge, but had no power to hire or fire. She told Miss Gallo, one of the employees, however, that Mr. Mayhew did the hiring, but she did the firing. Miss Weitzel was listed upon the payroll as an employee. Mr. H. B. Wallace referred to her as a "forelady". Mr. Mayhew treated her as such. The girls under her considered her a forelady. The only difference between the authority of Miss Weitzel and that of the foremen of the match department was that they could discharge an employee, while she could only do so upon authority from Mr. Mayhew.

In the spring of 1937, when there was much activity in the formation of labor organizations, it was suggested, on behalf of the Loyalty and Service Club, to H. B. Wallace that it might act as a bargaining representative for the employees of the Company. Mr. Wallace informed the representative of the Club who made the suggestion that that would be contrary to the National Labor Relations Act. The Board of Directors, in considering the probability of the employees forming or joining a union, concluded that one union for all of the factory employees would be preferable to separate unions for the employees of the various departments, and the officers of the Company felt that an unaffiliated union would be better to deal with than an affiliated one. These conclusions, so far as the record shows, were not communicated to the employees.

In April and May, 1937, the employees of a concern near the Sixth Street Plant of the Cupples Company were striking for higher wages. They had joined an affiliated union of the industrial type. They had been offered an increase of 3 cents an hour prior to the strike. They were out some six or eight weeks, and, when

the strike was settled, they received the 3 cents an hour increase originally offered. A number of the employees (not match-workers) of the Cupples Company watched the development of this strike. When the strike was over, these men (some of whom were members of the Loyalty and Service Club, but without a 5-bar rating) calculated that the striking employees would have to work about five years to recover the wages lost during the period of the strike. This indicated to them that strikes were unprofitable and that an independent union could probably do more good for its members than an affiliated union. It was also their thought that the employees of the Company owed a certain loyalty to the Company. These employees of the Company who had watched the strike referred to concluded that if any attempt were made to unionize the Cupples employees, they would try to form an independent union.

On or about June 17, 1937, John K. Wallace was advised by one of his friends that the Company's employees were about to be organized by an affiliated union, but no attention was paid to this information.

On June 24, 1937, the match department was in full operation with about 130 employees: 16 in the composition division, 35 on the penny match machine, 12 in the box division, 6 or 8 in the shipping division, and the balance on the nickel match machines. On the morning of that day, an organizer for the American Federation of Labor passed out circulars to the employees of the match department announcing an organization meeting to be held on the evening of June 25, 1937. That same morning, Joe Kountzelman, a foreman and a 5-bar member of the Loyalty and Service Club, brought to Frank Zimmerman, a machinist (a 2-bar member of the club) who worked under him, the form of a petition captioned as follows, "We, the undersigned, appoint ———— as a committee for collective bargaining." Zimmerman presented this form to a fellow-machinist, William E. Houghton, who was not a member of the Loyalty and Service Club, and asked if he would sign it. Houghton emphatically refused to have anything to do with it, stating that "it looked too much like it (the union) would be company dominated." That noon the same employees of the Company (including Houghton and Zimmerman), who had concluded that if any attempt to organize was made they would form an independent

union, decided that they would hold a meeting that evening and attempt to form one.

In the meantime, Mr. Bohlman, who was in charge of manufacturing operations, had reported to H. B. Wallace the circulation of the American Federation of Labor handbills. Mr. Wallace said to him, "It looks like we are in for it." He determined, however, that the Company should comply with the National Labor Relations Act, and instructed Mr. Bohlman to advise all in authority to the effect that the law permitted the employees to organize, and that those in authority would have to keep hands off and let the employees "go on as they please". These instructions were conveyed to Mr. Weaver, the head of the match department, and were transmitted to Mr. Mayhew, who relayed them to the foremen and to Miss Weitzel.

On the evening of June 24, 1937, about 18 of the Cupples employees, who were in the maintenance department supervised by Mr. Kountzelman, met together outside of the Company's premises in a room, for the rental of which they paid $1 out of their own pockets. They there formed a temporary organization of which Mr. Zimmerman was chosen president, Mr. Powell vice-president, Charles Conklin, Sr., secretary, and Steve Gradl, treasurer. Solicitors of memberships in the independent union planned were chosen at this meeting. An employee in the match department, George Cundiff, an engineer, was chosen as solicitor for the North Main Street Plant. Membership in the independent union was solicited that night by circulating a blank sheet of paper. On the morning of June 25, 1937, George Cundiff found upon his desk in the match plant forms of petitions similar to that which had been handed to Mr. Zimmerman the day before. Cundiff tore off the caption and wrote his own caption as follows: "We, the undersigned, agree to accept the following committee: Juanita Cundiff, Charles Conklin, and Harry Siebe as a committee in forming an independent union for collective bargaining." Juanita Cundiff was a daughter of George Cundiff and worked in the match department. George Cundiff proceeded to get signers for his petition in the plant. Irene Weitzel signed. He asked her to tell the girls on the penny match machine to stop at the time-clock in the plant on their way out

at noon, so that he could tell them about the plans for forming an independent union. About ten minutes before the lunch hour, Irene Weitzel told the girls individually that a man was going to speak at the time-clock during the lunch hour, and that it would be all right for them to sign the paper that he had. Mr. Cundiff spoke to the girls at the time-clock during the noon hour and procured a few signatures. Later in the day, Mayhew heard of this speech. He told Cundiff not to do that any more and not to take any more names on the job. Cundiff, however, disobeyed Mayhew's order in that regard whenever he could do so without being observed.

During June 24 and 25, 1937, Irene Weitzel talked to many of the girls on the penny match machine about the union activities which were taking place. She made statements to individual girls to the effect that it was all right for them to go to the "A. F. of L." (American Federation of Labor) meeting, but to watch what they signed; that it would be best for them to join the independent union, which she referred to as the "Company union"; that a girl that needed a job should "stick with the company"; that if the A. F. of L. tried to organize the employees the Company would close down; that the Company would not stand for a union; that they had been in business many years and had never had a union and that they would shut down the plant before they would have trouble with any union; that she had to hold her job like the rest and she wanted to go "Company union"; that if the A. F. of L. came in it was taking the bread out of her mouth; that the married girls had something to fall back on, but that if the plant closed she had nothing to fall back on. She told one girl that she had better sign the petition for the independent union because it was her (Miss Weitzel's) bread and butter and therefore bread and butter for all of them, and that if the girl did not sign there would be a six months' layoff. She told this same girl, that signing up with the A. F. of L. would make trouble. She asked another girl to sign the petition for the independent union before leaving the factory in the evening or else be laid off for a period of a few weeks or maybe six months.

Miss Cundiff, daughter of George Cundiff, was helping her father procure signers on the petition which he was circulating. In this connection, she told one girl: "You had better sign. I am telling you for your own good. All these girls who don't sign up are going to lose their jobs." She also argued that the girls owed the Company a certain loyalty and that the "C. I. O." and the "A. F. of L." should be kept out.

Olin Schmidt, a truck driver, was soliciting members for the independent union among the penny match girls during working hours. His arguments were to the effect that if they did not sign up, the Company would take the penny machine out and put a nickel machine in and they would be laid off, whereas if they signed up a place in some other department would be found for them.

Solicitation of members on Company time and Company premises was not confined to the partisans of the independent union. The affiliated union also had its advocates, who apparently had no hesitation in availing themselves of every opportunity to solicit for it. Whenever solicitation of employees on Company time or premises for either the independent union or the affiliated union was discovered by or called to the attention of those in authority, it was stopped.

On Saturday, June 26, 1937, Houghton and Zimmerman, representing the employees who were engaged in forming the independent union, called upon Mr. Bohlman on Company time and advised him that they required legal advice; and asked him to suggest a lawyer. He told them that he would get a list of lawyers for them. He consulted H. B. Wallace, who listed five or six lawyers of his acquaintance. Mr. Bohlman took the list to Houghton and told him that the employees were free to obtain any lawyer they desired, but that they should not employ certain lawyers not on the list, whom he named, who had sometimes been employed by the Company. One of the lawyers on the list furnished Houghton was Samuel B. McPheeters, who had been connected with the Labor Board originally established under the National Industrial Recovery Act. Houghton and Zimmerman selected him as the logical attorney for the organizers of the independent union. That evening—which was Saturday—Houghton got in touch with Mr. McPheeters, who agreed to meet with the committee of employees interested in organizing an independent union, on Sunday. Zimmerman, Powell, Gradl, Conklin and Houghton then gathered at the latter's home and made a

rough outline of what they thought they wanted in the way of an organization or corporation. On the following day (Sunday) Zimmerman and Houghton called on Mr. McPheeters, who was ill. He postponed meeting with them until Monday evening, agreeing either to meet with them then at his office or to have someone there with whom they could advise. Mr. McPheeters cautioned them against the solicitation of members for the independent union on Company time or Company premises. On Monday evening, June 28, thirty to thirty-five employees of the Company gathered at Mr. McPheeters' office. He was not there, but Wilder Lucas, an attorney and the office associate of Mr. McPheeters, was. They told Mr. Lucas what they had in mind in the way of an organization. He asked whether there were any foremen, assistant foremen, or any person acting in an advisory or administrative capacity, there. He was advised that there was no such person present. Mr. Lucas told them that there must be no solicitation of members on Company time or on Company property. They then discussed the advisability of incorporating. Mr. Lucas told them that it was unnecessary. They discussed the constitution of the proposed organization and agreed upon its contents. Mr. Lucas suggested that they procure some printed membership cards. They concluded to call the organization "Mutual Relations Association". Houghton got a printer out of bed and ordered him to print 500 initiation cards. Handbills calling a mass meeting for the evening of July 3, 1937, were also ordered and were subsequently passed to the employees on the sidewalk as they were coming to work. One of these handbills was posted in the match plant. Mayhew saw it and tore it down. Many of the employees in the match plant inquired of Mayhew as to which union to join. He told them to use their own judgment.

The mass meeting of employees for the purpose of organizing the independent union was held on the evening of July 3, 1937, outside of the plant. Two hundred and fifty or three hundred employees were present. Zimmerman, president of the temporary organization, opened the meeting, but turned it over to Houghton, chairman of the organization committee. Houghton read the proposed constitution drafted by Mr. Lucas to those present. About eleven o'clock the question of the adoption of the constitution was put to a vote, and the constitution was unanimously adopted. There were at that time more than two hundred employees present who had signed up for the independent union and paid the $1 initiation fee. Officers were elected, and also representatives from each department of the Company. Under the constitution, each department was entitled to a representative for every 25 employees or major fraction thereof in the department. These representatives constituted a council. All of the expenses incurred by the Mutual Relations Association and those who organized it were paid out of the initiation fees received from the members.

On July 8, 1937, upon the advice of counsel, the Mutual Relations Association sent to the Company a letter signed by Houghton, president of the Association. This letter contained a list of the officers and representatives elected and a statement of the number of members of the Association, which showed that a majority of the Company's factory employees belonged to it. The number of members was based upon information furnished by the treasurer, who had a record of those who had signed up and paid initiation fees. A meeting of the council of the Association was scheduled to be held at the Mark Twain Hotel, in St. Louis, the evening of Saturday, July 10, 1937. In the morning of that day, Houghton called at H. B. Wallace's office to inquire of him whether the Company was going to recognize the Mutual Relations Association as the sole bargaining agency for the employees of the Company. H. B. Wallace was not in, but John K. Wallace told Houghton that he would procure the information for him, if possible. Houghton wanted the information for the council meeting to be held that night. John K. Wallace told Houghton to meet him at the Union Station that evening, where Wallace had an engagement to see some of the members of his family who were leaving town. H. B. Wallace was at the St. Louis Country Club. John K. Wallace called him there and advised him of Houghton's request. H. B. Wallace was expecting to have to make a final decision with respect to employee representation. He had previously been advised by Houghton and Conklin that a formal request for the recognition of the independent union would be presented. The matter had been discussed by him with the officers and some of the members of the Board of Directors. Following his

conversation with H. B. Wallace over the telephone, John K. Wallace went to the Country Club, where his father wrote a letter reading as follows:

"St. Louis, 7/10.
"Mutual Relations Association,
"W. E. Houghton, Pres.
"Dear Sir:

"We have received your letter of the 8th notifying us that your organization represents a majority of our factory employees. We therefore recognize and are ready to meet with your council at any time.

"Very truly,
"Cupples Co. Mfrs.
"Harry B. Wallace,
"President."

This letter John K. Wallace delivered to Houghton at six o'clock P. M. at the Union Station. H. B. Wallace testified at the hearing that the letter he wrote at the Club was written as "a matter of precaution" against "any emergency that might develop", and that the "A. F. of L." was the emergency he had in mind.

The first meeting of those employees of the match department who wished to form a union to be affiliated with the American Federation of Labor was held on June 25, 1937. Many of the girls who were working on the penny match machine attended the meeting, regardless of the arguments and predictions of George Cundiff, Olin Schmidt, Miss Cundiff and Irene Weitzel. A local Matchworkers' Union was formed and an application was made to the American Federation of Labor for a charter. Thereafter further meetings were held, and a charter was granted, but no demand for recognition of the Union by the Company had been made at the time the Company recognized the Mutual Relations Association as the sole bargaining representative for the employees of the Company.

A meeting of the council of the Mutual Relations Association was held on July 13, 1937, to determine what demands should be made upon the Company on behalf of the employees. The representatives from the various departments had discussed common problems with the employees in their departments. Mr. Lucas, counsel for the Association, was present at the meeting of the council. Demands were drawn up for presentation to the Company, and Mr. Lucas was instructed to prepare a proposed contract embodying the demands

agreed upon, and the "Negotiation Committee" was instructed to present them. Mr. Lucas prepared a proposed form of contract, copies of which were furnished to Houghton, and one copy of which was taken to H. B. Wallace. At the request of Mr. Wallace, a copy of the constitution of the Association was furnished to him. Conferences were held with H. B. Wallace with regard to the terms of the proposed contract, and Mr. Lucas aided in pressing the demands of the Association upon the Company. These demands related to working conditions, wages, the Loyalty and Service Club, and a closed shop. H. B. Wallace promised to remedy the working conditions about which complaint was made, making it unnecessary to incorporate any reference thereto in the contract. (He subsequently carried out his promise in that regard.) He objected to a blanket increase in wages and stated that he desired to make a study of that question and to compare wages paid by the Company in its several departments with wages paid for like services by others. He agreed that if he was given time to make the study, any wage increases finally agreed upon would be made retroactive, so that the delay which occurred would not be at the expense of the employees. He objected to entering into any agreement definitely binding the Company to perpetuate the Loyalty and Service Club. Negotiations between the Company and the Association ended in a preliminary contract of August 4, 1937, which contemplated that a final agreement should be executed in thirty days. This preliminary contract, prior to its execution, was submitted to a meeting of the members of the Association and was approved by them. The Association concluded not to insist upon a closed shop provision or a definite agreement that the Loyalty and Service Club should be perpetuated. The terms of the final agreement were not settled in thirty days, and an extension of time was agreed to. The contract was finally executed on November 8, 1937, after having been approved by the members of the Association at a meeting held after the council of the Association had approved it. The contract entered into provided for a wage increase of approximately five per cent, to become retroactively effective as of the date of the preliminary contract.

During the time that the Company and the Association were negotiating for this

contract, Mr. Lucas, as attorney for the Association, had frequent conferences with counsel for the Company with respect to the form and terms of the contract. The Mutual Relations Association received no funds, compensation or financial support from the Company and neither did those who organized the Association. It employed its own attorney, paid its own expenses, and attended to its own business, so far as the record shows. At the time of the hearing it was still indebted to Mr. Lucas for a balance of $50 on account of services.

The foregoing, we think, presents a fairly accurate picture of the situation with which the Board had to deal in determining whether the Mutual Relations Association was company fostered, influenced, interfered with and dominated.

The facts relative to the alleged discrimination in laying off, on July 14, 1937, of employees working on the penny match machine, which was closed down on that day, are, briefly and generally, these: On that day the Company commenced to convert the penny match machine into a nickel match machine. This was done for business reasons. The nickel match machine required a crew of 5 girls for its operation. The penny match machine required a crew of 30 to 35 girls: 20 on the belt, known as sliders, 5 wrappers, 4 box feeders, and 4 or 5 other girls known as casers. Since it was intended to operate the nickel match machine in three shifts, it was thought that about 20 of the girls who had been on the penny match machine could be used after the machine was converted. On July 12, 1937, Mr. Mayhew instructed Irene Weitzel to send one unit of 4 girls from the penny match machine each day for tryouts on the nickel machines under the supervision of James Flynn, a foreman. These girls were to be taken from the head or top of the belt, where the most efficient girls were supposed to be located. About 12 girls had been tried out on the nickel match machine up to the time that the penny match machine was discontinued. Instructions had been given by H. B. Wallace that there was to be no discrimination made in laying off the girls on the penny match machine. Irene Weitzel had received instructions from Mayhew to lay off all of the girls on the penny match machine on July 14, with the promise that they would be taken back as needed. Miss Weitzel knew the union affiliations of the girls. She instructed them that they were laid off, as she was directed to do, but told one girl, who belonged to the Mutual Relations Association; "You don't have to worry, kid." This girl was called back to work at eleven P. M. on July 15, 1937. Miss Weitzel said to her: "You see what happened to those kids that belonged to the A. F. of L. You will see what will happen to the rest of them on the nickel machine in about another month."

The machine which had been used for making penny matches was ready for operation as a nickel match machine on July 20, 1937. In the meantime, Mayhew, for the purpose of determining who should be recalled, discussed the various girls who had been laid off with Flynn and Irene Weitzel, both of whom made suggestions to him relative to the efficiency of each of the girls. All of the girls who were members of the Mutual Relations Association were recalled, some as early as the day after they were laid off. A few of the girls who were members of the American Federation of Labor were later reemployed. Mr. Mayhew said to one of these, "Are you willing to forget all this nonsense and go back to work?" Upon being asked what he referred to, he said, "You know what I mean."

On July 19, 1937, Al Towers, a general organizer for the American Federation of Labor in St. Louis, complained, on behalf of the Matchworkers' Union, to Mr. Mayhew that the group laid off on July 14 who belonged to that Union had been discriminated against. He was referred to Mr. Weaver, manager of the match department, who denied any knowledge of discrimination, but agreed to investigate. Mr. Towers asked Weaver to meet a committee from the match department for the purpose of collective bargaining. Weaver informed him that the Company was considering recognizing the Mutual Relations Association as the sole bargaining representative for all of its employees. Towers then corresponded with H. B. Wallace relative to the alleged discrimination against the girls belonging to the Matchworkers' Union who had been laid off, and also relative to that Union's representing the employees of the match department for the purpose of collective bargaining. The Company refused to reinstate the girls or to bargain collectively with the Union to which they belonged and which claimed to represent a majority of

the employees in the match department. A conciliator from the United States Department of Labor attempted to settle the controversy between the Company and the Union but the Company adhered ·to its position that the Mutual Relations Association was the bargaining agency for all of its employees. On August 17, 1937, the Matchworkers' Union called a strike of its members, and from that date and up to the time that the hearing terminated the match department was closed.

The girls who are said to have been discriminated against were those who had been· employed· between March 9 and July 14, 1937. All of the employees on the penny match machine, with the exception of Irene Weitzel, were new, inexperienced match workers. It seems not improbable that there was little choice among them so far as efficiency was concerned. The girls who may be considered as a group with respect to the charges of discrimination are: Florence Harris, Marie Ellington, Virginia Frazier, Irma Endris, Irene Trail, Clara Gotthardt, Adele Gotthardt, Hazel Graetzer, and Armele Lampe.

Two other employees are alleged to have been victims of discrimination: Daisy Whiteman and Jessie Henry Wilbur.

Daisy Whiteman was employed in April, 1937, to work on the nickel match machines under Jimmy Weaver, a foreman and a son of the manager of the match department. She first joined the independent union, and some three days later joined the Matchworkers' Union. She testified that one day Jimmy Weaver said to her, "Daisy, I wish you would stop pulling those horses so fast, if you don't the plant will shut down for six months and maybe it will never reopen again." She took this statement to be an attempt to caution her against soliciting members for the Matchworkers' Union. · Jimmy Weaver ·in his testimony denied that he said anything to Daisy Whiteman about the plant closing down, and that he used a race track expression, "not to save the horses", to indicate to Daisy that he thought she was not doing her share of the work in connection with the hand wrapping of matches. She was a good worker with a good record for attendance. She had been offered another position at one time, but had been told that she could have steady employment in the ·match department. On July 10, about three hours before closing time, she told Jimmy Weaver she did not feel well. He suggested that she go on and finish the shift. She was furnished some white pills (probably aspirin) by a Company nurse and carried on. She was sick in bed the next day. There was no telephone in the house. Two of her sisters who worked at the plant were not available. Her mother was at home, but was unable to use the neighborhood telephone. Daisy failed to notify her foreman that she would not be at work. He procured a girl to take her place, who was still there the next day when Daisy reported. As a disciplinary measure, he told Daisy to take another day off. She testified that she then said, "Jimmy, the attitude you took toward me, and you have been taking toward me, it looks like I am going to have to quit." Jimmy Weaver testified that what she said was, "If I have to take a day off I will quit"; that he then asked her if she meant it; that she said, "yes"; and that he told her he would make out her exit card and send it in, and thereupon she left. His statement on the exit card was, "Quit of own accord when reprimanded for taking day off without permission." His recommendation at that time was that she be not re-employed. A few hours after this occurred, Miss Whiteman returned, apologized, and asked for her job back. Jimmy Weaver said that she would have to apply for re-employment, that the matter was out of his hands, but that he would talk it over with his superior. He testified that he recommended her re-employment, but that she was not re-employed. There was no fixed rule requiring that employees give notice of their intention to lay off on account of illness, but he had adopted that rule, 'and he intended to discipline her for not advising him of her intention to be absent from work, although such a dereliction as she was guilty of had not previously been regarded as calling for such discipline.

Jessie Henry Wilbur was a married man, 26 years old, who was on W. P. A. when he was employed by Mayhew, who told him that the work that he was employed to do might be temporary, and asked him if he could get back on W. P. A. if he was laid off. Wilbur told him that he could. Wilbur's duties were cleaning floors, oiling the paste machines, putting paste in the machines, procuring supplies, and doing other general work of that character. He was under the supervision of

Irene Weitzel. He was laid off on July 14, with the rest of the crew of the penny match machine. He then informed Mayhew that he was unable to get back on W. P. A. Mr. Mayhew testified that this irritated him, because he thought that Wilbur had lied to him originally when he told him that he would be able to get back. He employed a new man to take Wilbur's place. Wilbur had joined the Matchworkers' Union on June 29, 1937.

 1. The first question to be determined is whether the conduct of the Trial Examiner at the hearing of the consolidated cases was so unfair as to constitute a denial of due process.

The petitioner claims that it did not receive a full and fair hearing. It points out that the cross-examination by the Examiner of its witness Mayhew covers 61 pages of the record; that the questioning by the Examiner of its witness Bohlman covers 36 pages; that the questions asked by the Examiner and the answers of H. B. Wallace thereto occupied 42 pages of the record; and that George Cundiff's questioning by the Examiner covers 16 pages. The petitioner asserts that the Board was represented by able counsel, and it specifically directs attention to a question asked by the Examiner of the witness Houghton in connection with an inquiry as to the reasons why those interested in organizing an independent union secured legal advice from Mr. Lucas. The question was, "Whether or not Mr. Lucas' advice was the advice of Mr. Smith (counsel for petitioner), do or do you not know?" We agree with the petitioner's contention that the Trial Examiner exceeded all reasonable bounds in examining—or, rather, cross-examining—the witnesses of the petitioner. The Board was represented by competent counsel, who was in no need of assistance in presenting the Board's case. The question asked of the witness Houghton, which carried the inference that the advice of Mr. Lucas might have been the advice of Mr. Smith, the attorney for the Company, was offensive and without justification. There was not one scintilla of evidence in the record to justify any inference that Mr. Lucas and Mr. Smith were in collusion at any time or in any way or that Mr. Lucas had not honestly and faithfully performed his duties as attorney for his clients, the employees who formed and administered the Mutual Relations Association. This in-

cident of the hearing illustrates the truth of the statement of Judge Stone in the case of Montgomery, Ward & Co. v. National Labor Relations Board, 8 Cir., 103 F.2d 147, 156: "Counsel for the Board seems to have been proficient and this exaggerated participation by the examiner is not commendable—it is likely to, as it did here, shade into partisan activity." The conduct of the Trial Examiner in this case, however, differed greatly in degree, if not in kind, from that considered by this Court in the case just referred to, in which the order of the Board was set aside because of the unfairness of the hearing before the Trial Examiner. Here, the Trial Examiner was courteous, and there is nothing to indicate that his examination of the petitioner's witnesses was seriously objectionable to the petitioner. We realize, of course, that the failure of counsel for the petitioner and counsel for the intervener to object may well have been due to their feeling that that course might antagonize the Examiner to the detriment of their clients. If a trial examiner will only keep in mind that the proper exercise of his functions requires open-mindedness, fairness and impartiality, and if he will, within reasonable limits, permit each of the parties to the proceeding before him to prove his own case, in his own way, by his own counsel, he will save himself from criticism and avoid furnishing any basis for a charge that the hearing was unfair and that bias was shown.

Although we think that the conduct of the hearing by the Trial Examiner is justly subject to criticism, we do not think that it was so unfair as to constitute a denial of due process.

 2. The next question to be determined is whether the finding of the Board that the formation of the Mutual Relations Association and its administration was dominated, interfered with, and supported by the Company is sustained by substantial evidence.

The National Labor Relations Act provides that it shall be an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." 29 U.S.C. § 158(2), 29 U.S.C.A. § 158(2).

The findings of the Board are conclusive "if supported by evidence." 29 U.S.C. § 160(e), 29 U.S.C.A. § 160(e). "But as has often been pointed out, this,

as in the case of other findings by administrative bodies, means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 301 U.S. 142, 57 S.Ct. 648, 81 L.Ed. 965; Consolidated Edison Co. of New York v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 93 F.2d 985, 989; National Labor Relations Board v. Thompson Products, Inc., 6 Cir., 97 F.2d 13; Ballston-Stillwater Knitting Co. v. National Labor Relations Board, 2 Cir., 98 F.2d 758, 764. Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' Consolidated Edison Co. of New York v. National Labor Relations Board, supra [305 U.S. 197], 59 S.Ct. [206], 217 [83 L.Ed. 126], and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. See Baltimore & O. R. Co. v. Groeger, 266 U.S. 521, 524, 45 S.Ct. 169, 170, 69 L.Ed. 419; Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L. Ed. 720; Appalachian Electric Power Co. v. National Labor Relations Board, supra, page 989 of 93 F.2d." National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 299, 300, 59 S. Ct. 501, 505, 83 L.Ed. 660.

The evidence adduced before the Trial Examiner indicated that the Mutual Relations Association was a labor organization consisting exclusively of employees of the Company, and was organized and administered by them for their own benefit; that the Company had furnished no financial or other support to the Association; and that no officer, director or executive of the Company had participated in either its formation or administration; and that the executives of the Company had done what reasonably could be done to discourage organizational activities of employees upon Company time and Company premises.

The evidence that the Company welcomed the organization of an independent union of its employees and preferred such a union to any other, and made haste to recognize the Association as the sole bargaining representative for all of its employees, is not a sufficient factual basis for the finding of interference, domination and support. This for the reason that, while such evidence is consistent with the hypothesis that the formation and administration of the independent union was interfered with, dominated and supported by the Company, it is not inconsistent with the contrary hypothesis, and therefore supports neither. Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; Stevens v. The White City, 285 U.S. 195, 204, 52 S.Ct. 347, 76 L.Ed. 699; Ewing v. Goode, C.C., 78 F. 442, 444; Eggen v. United States, 8 Cir., 58 F.2d 616, 620.

It is true, however, that if the Company, under the evidence, can be found to have been responsible for the activities of Irene Weitzel, George Cundiff, Juanita Cundiff or Olin Schmidt, then the question of interference and domination by the Company with the formation of the Association was a question of fact for the Board to determine, and this Court must accept its finding in that regard as conclusive.

The Cundiffs and Schmidt were mere employees without supervisory authority, and it is not seriously argued that there is any substantial basis in the evidence for a finding that they were acting for the Company in encouraging membership in the Association and discouraging membership in the Matchworkers' Union. The Board contends that, since Irene Weitzel was shown to have been regarded and referred to as a "forelady" or "supervisor", a finding that her interference and domination in connection with the formation of the Association was the interference and domination of the employer was justified. It seems to us that the question of her title is unimportant, and that the vital question is whether, under the evidence, she was or could reasonably be found to be the representative of the Company in connection with her activities relating to the two labor unions.

It is elementary that a principal is only bound by the acts of an agent which are within the scope of the actual, implied or apparent authority of that agent. Miss Weitzel had no actual authority from the Company to encourage or discourage memberships in labor organizations. There is no evidence which would support a find-

ing that she had implied authority to do so. Implied authority is nothing more than actual authority circumstantially proved. Koivisto v. Bankers' & Merchants' Fire Ins. Co., 148 Minn. 255, 181 N.W. 580; 2 C.J. 435; Hall v. Union Indemnity Co., 8 Cir., 61 F.2d 85, 92. So far as her apparent authority is concerned: "It is only acts within the scope of the apparent authority with which the principal clothes the agent, not those within the scope of the apparent authority with which the agent wrongfully clothes himself, without the assent or knowledge of his principal, that are binding upon the latter." Chicago, St. P., M. & O. Ry. Co. v. Bryant, 8 Cir., 65 F. 969, 973. See, also, Hall v. Union Indemnity Co., 8 Cir., supra, 61 F.2d at page 91.

There is no evidence in the record that Miss Weitzel was ever held out by the Company as a person having authority to advise others with respect to joining or not joining labor organizations. What her fellow-employees of the match department may have assumed her authority to be and what she may have represented it to be, we regard as unimportant in so far as the Company is concerned, since there is no proof that her acts which are complained of were done at its direction or with its knowledge or consent. It would be strange if the efforts of the employees of the petitioner to organize and to select representatives for collective bargaining could be utterly frustrated and destroyed through attributing the acts of one of their number—who, so far as the record shows, was eligible to membership in both the Association and the Matchworkers' Union —to the employer, without any showing that the employer had ever authorized, consented to, or was aware of such acts.

An analogous situation was considered by the Circuit Court of Appeals of the Second Circuit in Ballston-Stillwater Knitting Co. v. National Labor Relations Board, 98 F.2d 758. The court said, on page 762: "The Board found that the supervisory employees gave some of the workers to understand that they had better sign with the Association if they wished to keep their jobs. It may be noted, however, that the very few witnesses who testified to such threats were not sufficiently impressed thereby to join the Association. If the persons making such threats had no power to discharge, it is difficult to see any more reason for imputing such

threats to the employer than for imputing to him a similar argument made by an ordinary employee in soliciting members. As already stated, the employees were acting for themselves, not for the petitioner, in organizing the Association. There is no evidence that the superintendent or any one else connected with the management, ever knew of the threats so there could be no ratification of them. In our opinion there is no substantial evidence to support the Board's ultimate findings that the petitioner interfered with the employees' rights of self-organization or dominated or interfered with the formation or administration of the Association." See, also, National Labor Relations Board v. Union Pacific Stages, Inc., 9 Cir., 99 F.2d 153, 178; Peninsular & Occidental S. S. Co. v. National Labor Relations Board, 5 Cir., 98 F.2d 411, 413.

The Board cites Virginia Ferry Corporation v. National Labor Relations Board, 4 Cir., 101 F.2d 103, in which the court said (at pages 105, 106): "Likewise we think that the Board was correct in its holding with respect to the responsibility of the employer for the statements of Captain Stone. The mere fact that it was not shown that the captain had authority to hire and discharge is immaterial. He was the employer's representative in the navigation of the vessel of which he was in command, charged with the duty of maintaining discipline among officers and crew; and it is inconceivable that his recommendations with respect to discharge would not have been followed. Irrespective of this, however, his relationship to the owner was such that the doctrine respondeat superior unquestionably applies."

The relation of a ferry-boat captain to the crew of his vessel is clearly distinguishable from the relation of a supervisory employee on a penny match machine to the employees on that machine, who at least have ready access to those who are in actual authority, for information and for the redress of any grievances. The evidence in the case before us indicates that Mayhew, who possessed authority to employ and discharge, was actually consulted by many of the employees working with Miss Weitzel, and that he told them to do as they pleased with respect to joining a union. We think that the doctrine of respondeat superior can not, under the circumstances disclosed by the evidence in this case, be invoked by the

Board to justify its finding that the Company dominated, interfered with and supported the formation or administration of the Association. As already pointed out, Miss Weitzel, in encouraging and attempting to influence members of the force with whom she was associated to join the Association, was engaged in the performance of no duty for the Company, was acting outside of the scope of her employment, and can hardly be said to have been furthering the business of her employer, even though she may have believed that she was doing so. If the doctrine is applicable to her situation, it would seem to be equally applicable to every other employee who solicited members for the independent union, and the necessary result would be that all such employees might be regarded as acting for the Company and not for themselves. There are, no doubt, situations where the relation of a supervisory employee to the employer is shown to be so close and his authority over the employees under him of such a character that a conclusion that he was acting for the employer, and not for himself or for his fellow-employees, in encouraging membership in one union and discouraging it in another, would be justified. See and compare, National Labor Relations Board v. J. Freezer & Son, Inc., 4 Cir., 95 F.2d 840, 841; National Labor Relations Board v. Wallace Mfg. Co., Inc., 4 Cir., 95 F.2d 818, 820; National Labor Relations Board v. American Potash & Chemical Corporation, 9 Cir., 98 F.2d 488, 494; National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951, 956.

■ It is our opinion that it was incumbent upon the Board, in order to sustain the charge that the Company had dominated, interfered with, and supported the formation and administration of the Mutual Relations Association, to prove, by a fair preponderance of the evidence, that the Company had, through its officers, its executives, or its authorized agents, committed acts amounting to domination, interference or support, or that it had aided, abetted, counseled, commanded, induced, or procured the commission of such acts. In other words, we think that it was necessary for the Board to prove not only that acts amounting to interference with or domination or support of the independent union were committed, but also that with respect to the commission of such acts the Company virtually stood in the relation of either a principal or an accessory. We

are also of the opinion that no doctrine of imputed liability can be invoked by the Board in this case to bridge the hiatus in its proof.

■ Our conclusion, therefore, is that there is no substantial evidence to sustain the finding of the Board that the Company was guilty of an unfair labor practice with respect to the formation or administration of the Mutual Relations Association.

Our conclusion in this regard, we think, is not opposed to the decision of this Court in the case of Cudahy Packing Co. v. National Labor Relations Board, 8 Cir., 102 F.2d 745, in which it was held that there was a sufficient basis in the evidence for the Board's finding of company support of the independent union there involved. In that case there was evidence that the plant manager had rented a room in which the employees interested in forming the independent union met with him; and that the attorney employed to organize the independent union had formerly represented the company in certain instances. There was, in addition, testimony to the effect that an officer of the independent union had made admissions indicating that it was subject to company dictation. We said, 102 F.2d at page 751: "While the evidence, by no means, shows any flagrant interference, much less coercion of employes in the formation or maintenance of the independent union, yet we cannot say there is not some, even though small, substantial evidence of company influence in the course of the organization and in the continued activities of this union. However, it does seem clear from the evidence that this company influence was relatively slight and that the situation here is quite different from the aggravated company action and coercion revealed in some cases, such as National Labor Relations Board v. Pacific Greyhound Lines, 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838, and National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. There is enough evidence to sustain the order of the Board in so far as the 'cease and desist' provisions are involved."

It seems quite evident to us that the Cudahy case was considered by this Court to be a borderline case, and that the order of the Board was sustained upon evidence which was regarded as barely sufficient for the purpose.

Under the evidence in this case, the Mutual Relations Association is the only existing labor organization of the employees of all of the departments of the Company. To strike it down as the bargaining agency for the employees of the Company because of the utterances of Irene Weitzel to some twenty employees of the match department, who had been employed for only a few months and who, with two exceptions, testified that they paid no attention to what she said to them, but joined the Matchworkers' Union, is, we think, entirely unwarranted, particularly in the absence of any showing that she was acting for her employer or with its knowledge or consent in making whatever statements she did make. See and compare, National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951, 955–958.

■ The Board apparently has all the power and machinery which it needs for ascertaining, through an honest election by secret ballot, held under its direction, whether this accused independent union which is suspected by the Board is in fact the chosen representative of the employees who, the evidence shows, have organized, and dominate it, or whether it is not. See Cudahy Packing Co. v. National Labor Relations Board, 8 Cir., 102 F.2d 745, 752, 753. If it is in truth and in fact an organization formed and administered exclusively by the employees and is the chosen representative of a majority of them, there is no excuse for destroying its usefulness for the purpose for which they created it. Its destruction would, in that situation, defeat the very purpose for which the National Labor Relations Act was enacted, namely, to protect and safeguard the right of employees to organize and to bargain collectively through representatives of their own choosing. Ninety-five per cent of the employees of the Company have been there more than one year, and have substantial rights acquired because of their seniority and because of the long-established profit-sharing and insurance plans. The wishes of a majority of them with respect to a choice of representatives for collective bargaining are entitled to respect and consideration and ought not lightly to be disregarded because of the complaint of a rival organization formed by some of the most recent employees of the last and least department of the Company.

■ 3. The next questions are those relating to the charges of discrimination.

With respect to the nine girls laid off on July 14, 1937, we think the Board reached a permissible conclusion in finding discrimination. Concededly, Irene Weitzel had authority to recommend the employment and discharge of persons connected with the penny match machine. She was shown, by the evidence of the Board, to have been a bitter partisan of the independent union. She undoubtedly knew the union affiliations of all of the girls on the machine. She had threatened those who joined the Matchworkers' Union with layoffs. It was a fair inference, therefore, that in recommending to Mayhew the girls who were to be kept she favored those belonging to the Mutual Relations Association.

■ Wilbur's case stands in about the same situation. He worked under Irene Weitzel. There is no evidence that he was discharged on her recommendation. He was, however, in a place where the battle between the contending unions seems to have been the hottest. It may be inferred that joining the Matchworkers' Union did not increase his popularity with the partisans of the independent union. Mayhew's explanation of his reasons for the discharge of Wilbur may be true, but their improbability and inadequacy justified the Board in rejecting them. Without that explanation, there was no apparent reason for Wilbur's separation from the service. His services, or those of someone like him, were needed. It seems probable that his joining the union was at least a contributing cause of his discharge.

■ The case of Daisy Whiteman is a puzzling one. She apparently was responsible for getting herself off of the payroll. Otherwise there would have been no point in her returning for the purpose of apologizing to Jimmy Weaver. One may suspect—as the Board did—that if she had been a loyal member of the Mutual Relations Association, her exit card would have been recalled. It seems not improbable that the Board guessed correctly, but we think that the finding was based upon too many inferences. It must have been inferred, from the remark about "pulling the horses", that Jimmy Weaver knew of her affiliation with the Matchworkers' Union and resented it, although it appeared that she was also a member of the Mutual Re-

lations Association. It must also have been inferred that, contrary to his testimony that after she had apologized he recommended her re-employment, he did not in fact do so or that his father, manager of the match department, decided not to accept Jimmy's recommendation because the father may have known of her affiliation with the Matchworkers' Union—not because he had a surplus of girls ás the petitioner's testimony indicates. It seems to us that any conclusion as to why she was discharged is pure guesswork.

The Trial Examiner recommended that the persons who, he found, were discriminatorily discharged should be made whole for any loss of pay suffered between the date of their discharge and the date of the strike, August 17, 1937. The Board's order would entitle them to back pay up to the time of reinstatement or placement upon a preferential list. Since a stipulation was filed at the hearing to the effect that none of these persons would have accepted employment with the petitioner after August 17, the date of the strike, and since this stipulation has never been modified or withdrawn, we are unable to understand how any of these persons can be entitled to back pay after August 17, or to reinstatement. Surely an employer can not be compelled to reinstate or pay persons unwilling to work for him.

Our conclusions are:

1. The cease and desist order of the Board must be vacated and set aside.

2. The order of the Board, in so far as it provides that Florence Harris, Marie Ellington, Virginia Frazier, Irma Endris, Irene Trail, Clara Gotthardt, Adele Gotthardt, Hazel Graetzer, Armele Lampe, and Jessie Henry Wilbur, are entitled to be made whole for any loss of pay suffered by them after July 14, 1937, and up to August 17, 1937, should be affirmed.

3. The order of the Board, in so far as it requires the reinstatement, with back pay after August 17, 1937, of the persons above named and of Daisy Whiteman, must be vacated.

A decree will be entered in accordance with this opinion.

WOODROUGH, Circuit Judge (concurring in part).

It appears to me that the corporation vested Miss Weitzel with such authority, actual and apparent, over the girls who worked under her that the evidence of the threats and coercion she employed towards them, as well as of the discharges made at her instigation, were competent against the corporation.

I can not concur in the court's comment upon the conduct of the examiner. It seems to me that it is the function of an examiner to earnestly try to find out the truth from the witnesses before him. It also seems to me that where, as in this case, the lawyer for the company union was suggested by the company's managing officers, a shrewd question or two about that matter was fairly in order. I see no error in the Board's conclusion as to reinstatement and back pay for the unlawfully discharged employees. They went on strike against unlawful action of the company and of course were unwilling to work for the company during the strike. But upon their vindication by the Board and this court, the remedy accorded them was proper.

In all other respects I concur in the court's opinion and recognize the painstaking care that has been given to working out just solutions of the many difficult problems presented on the large record.

On Petition for Rehearing.

SANBORN, Circuit Judge.

The respondent in its petition for a rehearing of this case points out that its order not only required the Cupples Company to disestablish the Mutual Relations Association as a bargaining agency, to withdraw all recognition of the Association as such, and to give no effect to the contract entered into by the Association with the Company, but also required the Company to desist from the unfair labor practice of making discriminatory discharges of its employees. The Board then points out that that portion of its cease and desist order dealing with discriminatory discharges was based upon its finding that such discharges had occurred; and that this Court sustained the Board's finding in that regard, but directed that the entire cease and desist order be set aside.

It was not our intention to disturb the order of the Board further than was absolutely necessary to make it conform to our determination of the questions argued. The writer of the opinion overlooked the fact that the cease and desist order dealt with discriminatory discharges. It is obvious

that so much of that order as was based upon the Board's finding that the Company had been guilty of discrimination in discharging certain of its employees is valid under our decision. The opinion is modified accordingly.

The petition for a rehearing is denied.