## NATIONAL LABOR RELATIONS BOARD v. INTERNATIONAL SHOE CO. (WESTERN BROTHERHOOD OF SHOE & RUBBER WORKERS, Intervener).

### No. 478.

Circuit Court of Appeals, Eighth Circuit.

Dec. 10, 1940.

David C. Shaw, of St. Louis, Mo., Atty., National Labor Relations Board (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Samuel Edes and Edward J. Creswell, all of Washington, D. C., Attys., National Labor Relations Board, on the brief), for petitioner.

Richard O. Rumer, of St. Louis, Mo., (R. E. Blake, of St. Louis, Mo., on the brief), for respondent.

Charles E. Rendlen, of Hannibal, Mo. (Branham Rendlen and Rendlen, White & Rendlen, all of Hannibal, Mo., on the brief), for intervener.

Before STONE and GARDNER, Circuit Judges, and OTIS, District Judge.

OTIS, District Judge.

On May 8, 1939, the National Labor Relations Board, petitioner here, referred to hereinafter as the Board, filed its decision and order in the Matter of International Shoe Company and Local Unions Nos. 248 and 709 Boot & Shoe Workers International Union, affiliated with American Federation of Labor. The proceeding had originated in charges filed by Locals 248 and 709. Those charges resulted in the Board's complaint that the Shoe Company had engaged and was engaging in certain unfair labor practices. After extended hearings the Board, by its decision, determined that the Shoe Company, respondent here, had engaged in some of the unfair labor practices complained of and, by its order, required the Shoe Company to cease and desist from such practices and to take certain specified affirmative action. The Board has petitioned this court for the enforcement of its order. Whether the order and the findings upon which it was bottomed were supported by substantial evidence is the chief question here presented.

The International Shoe Company is a Delaware corporation whose principal offices are in St. Louis. It operates several plants where shoes are manufactured. One of its plants, the one with which we now are particularly concerned, is at Hannibal, Missouri. At Hannibal the Shoe Company employs approximately 3000 persons, a substantial part of Hannibal's total population of approximately 23,000. Prior to July 8, 1937, the employees of the Shoe Company at Hannibal had no organization.

On June 5, 1937, three of the Shoe Company's employees conceived the idea of forming a local organization. They consulted the county prosecutor. They and one other consulted two of Hannibal's former mayors. On June 18, 1937, they conferred with one Nerlich, the Shoe Company's Hannibal superintendent. There was a stenographic report of what was said at this conference. The great importance which has been attached to what then was said by the superintendent makes it necessary that it should be described in some detail hereafter.

Following the conference with the superintendent approximately twenty employees met, on June 20th, at the home of one of them and there definitely formed a tentative organization. An attorney was employed and temporary officers elected. At a meeting on June 21st a name—Western Brotherhood of Shoe and Rubber Workers—was selected. (We

shall speak of this organization hereafter as the Brotherhood). On July 8th a constitution was adopted and permanent officers were elected. (Hence we have chosen to speak of July 8th as the date when an organization of the Shoe Company's employees at Hannibal first was effected.) On July 21, 1937, the Shoe Company granted the Brotherhood's request that it be recognized as the collective bargaining agency of its members.

An agent of the Boot and Shoe Workers International Union, affiliated with the American Federation of Labor appeared upon the scene in August, 1937. He had been sent in by the General President of the Union to attempt to organize the Shoe Company's employees and he did organize the two locals which filed the charges resulting in the Board's complaint. In February, 1938, the Shoe Company granted the same contractual privilege to the Union it had previously granted to the earlier organized Brotherhood.

### The Complaint

We set out now the essence of the complaint preferred by the Board against the Shoe Company. It is charged in the complaint that the Shoe Company dominated the formation of the Brotherhood and in that manner interfered with the free exercise of their rights by employees. It is charged that the Shoe Company "from on or about and after July 27, 1937, to and including the date of the issuance of this complaint" coerced its employees in their right of organization by—

(a) Threatening its employees with discharge if they joined the Union; (b) uttering and disseminating disparaging remarks about the Union, its officers, its organizers and activities; (c) keeping the members of the Union under surveillance in the conduct of their Union activities; (d) threatening to close down its Hannibal plant and arranging to have the work done in other of its plants if the Union should succeed in obtaining as members a majority of its employees at the said Hannibal plant; (e) temporarily laying off or demoting various of its employees for Union activity; (f) and by other means.

It is charged also in the complaint that the Shoe Company discharged various employees because they were affiliated with the Union or had refused to affiliate with the Brotherhood. (This element of the complaint finally was dismissed.)

The several alleged acts are charged to be unfair labor practices.

Of the several charges set out in the complaint some were dismissed and some sustained in findings of fact which we now epitomize. It was found as a fact that the Shoe Company dominated the Brotherhood in that (1) the acts charged to have been committed by the Shoe Company "from on or about and after July 27, 1937" were made significant and given color by a background of Shoe Company opposition to the organization of its employees. (We set out in the margin a full synopsis of the finding with reference to the background[1]). The Shoe Compa-

---

[1] The date when unfair practices are charged in the complaint to have begun was July 27, 1937. The last event in the so-called "background" occurred more than two years before that date. The several incidents and attitudes said to constitute the background are these: (1) Some residents of Hannibal had an impression that the Shoe Company might seek to discourage union activity among its employees by reducing its production of shoes in Hannibal. (2) By reason of that impression there existed in Hannibal on the part of some an attitude of watchfulness toward outside labor organizations coming in. (3) The Shoe Company had knowledge of the impression and the consequent watchfulness and fostered them. (4) In 1933 a vote was taken of employees of the Shoe Company at Hannibal to determine whether they preferred a local or national organization. When the vote turned out to be favorable to a

national organization, the Shoe Company's Superintendent, who had caused the vote to be taken, announced that it was not necessary to have any labor organization in the Company's Hannibal factories. (5) Some of the Shoe Company's employees in Hannibal were organized in 1933 by the Shoe Workers Protective Union. That union disappeared by the end of 1933. (6) When attempts were made in 1933 to organize employees one agent of the Shoe Workers Protective Union was met at the railway station by a mob. Some of the leaders of the mob were employees of the Shoe Company and later were among those who organized the Brotherhood. During the period of the attempts to organize in 1933 the mayor of Hannibal consulted the Shoe Company's superintendent as to whether employees interested in the matter of organization of employees should be permitted to use a public park. In the same

ny dominated the Brotherhood, it was found, in that (2), in the conference of June 18, 1937, between employees and the Company's superintendent at Hannibal, the superintendent made a certain statement to the employees which was stenographically reported and set out in full in the findings and that he gave an interview to the Hannibal Courier-Post which also is set out in full. Again the Shoe Company dominated the Brotherhood, it was found, in that (3) an assistant superintendent and a general foreman made statements derogatory to nationally affiliated unions and thereby gave support to the Brotherhood.

## The Order

The Order, bottomed on the findings, required the Shoe Company to—

"1. Cease and desist from:

"(a) Dominating and interfering with the formation or administration of Western Brotherhood of Shoe and Rubber Workers, Incorporated, or of any other labor organization of its employees, and from contributing support to Western Brotherhood of Shoe and Rubber Workers, Incorporated, or to any other labor organization of its employees;

"(b) In any other manner interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, or to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection.

"2. Take the following affirmative action which the Board finds will effectuate the policies of the act:

"(a) Withdraw all recognition from Western Brotherhood of Shoe and Rubber Workers, Incorporated, as a representative of any of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work, and completely disestablish Western Brotherhood of Shoe and Rubber Workers, Incorporated, as such representatives;

"(b) Post immediately notices to its employees in conspicuous places throughout its Hannibal, Missouri, plants, and maintain such notices for a period of at least sixty (60) consecutive days, stating: (1) that the respondent will cease and desist in the manner aforesaid, and (2) that

---

period one of the foremen of the Shoe Company advised employees under his charge against joining any union. (7) During the attempts to organize employees in 1933, one of the employees of the Shoe Company consulted Nerlich, the superintendent of the Shoe Company, concerning the formation of a local "independent" union among the employees. Nerlich at that time expressed opposition to the organization of an "independent" union. (8) In 1935 an organizer for the Boot and Shoe Workers International Union came to Hannibal to organize the employees of the Shoe Company. He was called to a hotel where the mayor of the city and a mob of shoe workers met him. He was advised that the Company's employees were opposed to the A. F. of L. It was demanded that he leave the city. The use of the court house was refused to him and his associates. Shortly afterward he left Hannibal. (9) On April 5, 1935, an advertisement was published in the Hannibal Courier-Post, signed by employees of the Shoe Company, asserting their opposition to "radical organized pressure by outside organizers that make their living off of honest men and women." (10) On April 7, 1935, organizers for the Boot and Shoe Workers International Union were set upon and beaten by

employees of the Shoe Company. The assailants were permitted to plead guilty to common assault and were fined $5 each. (11) In a municipal campaign in Hannibal in 1935 the suppression of union activity was exploited and praised by candidates and in advertisements. (12) The successful candidate for mayor, who ran for office on the anti-union platform, when he took office consulted the Shoe Company's superintendent on the matter of unionization. (13) Another instance of mob violence against an outside organizer of labor unions in Hannibal took place in June in 1935. As a result of threats of further violence this organizer left Hannibal.

Such are the facts pointed and referred to as constituting "background." The essence of it is that there was an anti-union feeling among the citizens of Hannibal, bottomed on an impression existing among them that the Shoe Company was opposed to outside labor organizations coming into its factories and that the Shoe Company might lessen its production in Hannibal if such organizations were permitted to come in. In the whole of the finding touching background there is nothing directly involving the Shoe Company itself.

the respondent withdraws all recognition from Western Brotherhood of Shoe and Rubber Workers, Incorporated, as a representative of its employees, and completely disestablishes it as such representative;

"(c) Notify the Regional Director for the Fourteenth Region in writing within ten (10) days from the date of this Order what steps the respondent has taken to comply· herewith."

Was There Supporting Evidence?

Counsel for the Board at the argument in this court frankly confessed the difficult task he had in justifying the findings by the evidence. It was at once apparent that the foundation for the findings seemed shadowy and insubstantial. Counsel urged upon the court that it was necessary in this case to assemble all the facts, no one of which in itself was of much significance, and then to view the conglomerate in the light thrown on it from the background. Only so, said counsel in effect, could the findings and order be supported.

The piece of evidence regarded by counsel for the Board as most significant is the record of the conference on June 18, 1937, between employees interested in forming a local organization and the Shoe Company's superintendent at Hannibal, Mr. Nerlich. It was Nerlich who caused every word to be taken, down in shorthand and later transcribed. The Board regarded the record of this conference as so important that the whole was set out in the findings of fact. We set out the whole of this record here. It follows:

"Hannibal, Mo., Friday, June 18, 1937.

"Sixteen employees of the three plants came in and asked to see Mr. Nerlich. After W. C. Broaddus stated the purpose of the meeting Mr. Nerlich stated that the suggestion was one that recent legislation made it necessary for him to be very careful about expressing himself and asked their permission to call in a stenographer who could make a record of the entire meeting. After the stenographer was called in Mr. Broaddus repeated the purpose of the men's visit.

"Mr. Broaddus: About two years ago practically· this same group of men were here and asked how the company felt about their organizing at that time an independent union among the employees and at that time they were neutral on the subject. However, it has now come to a 'show down' and they have come in to ask how you feel about their organizing an independent union at this time.

"Mr. Nerlich: ' I am glad to talk with you about anything that is on your mind and unfortunately I cannot say a great deal on this subject. Recently laws have been passed regarding this subject so that we cannot advise you. In other words, I will say that it is a matter entirely up to you men. We haven't a thing in the world to say about it or against it and, of course, we can't say anything for it as it is a matter that is entirely up to you. I would like to say too that we have never had any trouble getting along with our people here and if you find it to your advantage to organize an independent group that is up to you. I am sure that our Aid Society has proven that you can do a good job of it and if you feel that it has come to a 'show down,' as Mr. Broaddus says, and that it is to your best interest, I think certainly it would be an all right thing to do.

"I would like to say if you decide to do this, do a good job of it like you try· to make good rubber soles, heels, and shoes.

"We have always been glad to co-operate with you and will be now.

"It is, of course, against the company's wishes to have a company union, but if you feel it is best to organize an entirely independent group I think that is up to you. The company of course will have nothing to do with it. It might be a good thing for you to do. However, as manager of the plant I can't say very much on the subject, but I would like to suggest that you talk with several business men and get their ideas. I am sure you men realize a thing of this kind is of very vital interest to the community and it is a matter to be seriously considered and I think you· would do well to see men that you know and have confidence in and sit down and talk to them about it. Mr. Hodgdon, Mr. Sparks, Judge Bigger, Father Fox, Rev. Schwehn, J. B. Robinson, and Sinclair Mainland would be good men to see and many others I might mention in this group. Let a few of you talk with them about it and see what they think concerning it.

"Mr. Broaddus: This is one of the reasons, Mr. Nerlich, we came down to see you. We want to keep out of the C. I. O. and the A. F. of L. and such organizations. We realize this is a very serious

thing and we knew we could sit down and talk our problems over with you.

"I don't believe it would be advisable for us to have a union here that could be managed by a group 1000 miles away. We don't want things to happen here that took place in Clarksville, Missouri, a few days ago or in the Hershey Company Plant or such things that happened here several years ago.

"I have been in this office several times myself when I thought things were not running smoothly and have always felt better after talking with you. I have been employed by the International Shoe Company for some time and am loyal to them and will be so long as I remain with them.

"Mr. W. Herrin: When Charles Giles suggested to me to come down here I thought about it all afternoon trying to think what should be done.

"Now, men, I don't know whether the organization of an independent union would be just exactly the thing or not. You all remember about two years ago how our outside friends started to organize here and that there was so much trouble and it seems to me this might have the same effect. They thought they were the right ones to organize us and such a thing might happen again if we were to organize an independent union.

"We want to have a place where we can work and make a living and where we can settle our own difficulties. I feel that the employees of the International Shoe Company have enough common sense to realize what they are up against. I feel that if four or five of the Rubber Plant men want to strike because they are dissatisfied for some reason that would be their own business and that we shouldn't have to strike. I feel that if something could be done along this line then we would really have an organization.

"Mr. Nerlich: Mr. Herrin, as I said before, that will be a matter that you men must work out, but for goodness sake do the thing you feel confident is the thing to do and get together and sit down and talk it over among yourselves and with some of the men downtown and tell them the things you feel in your heart will give you the best results. I must assure you I feel we will get along.

"Mr. Dan Mack: I have two nephews working in Michigan and they tell me of the serious trouble they have had and the way the C. I. O. has conducted its organization and the interfering manner in which their elections have been held. We certainly don't want anything of that kind in Hannibal.

"Mr. McIntyre: There is the question of two or three men being dissatisfied and wanting to call a strike. We will have an arbitration agreement that no strike will be called unless all agree.

"Mr. Nerlich: Men, the more I hear you talk the more I am impressed with your determination and I am sure you will try to do the right thing.

"I put you off two years ago because at that time I thought it would foster more trouble. Conditions have changed since then and we are having labor trouble all over the country.

"I believe you realize the seriousness of the situation enough and if you plan an independent organization I am sure you will work out your own problems and still keep in mind what is best.

"Mr. Broaddus: Mr. Nerlich, we are not coming to you this afternoon as superintendent, but as a friend we know and we would not do anything that you did not think best. We don't want to do anything that would cost us our job with the company or anything that is not best for the company.

"Mr. Nerlich: Men, I want you to know that the company appreciates your loyalty far more than you think and I am pleased and happy that you have come here. We have always agreed and I feel that we will on this. I want you to feel that you can always come in and talk over your problems with me.

"Under the present conditions I want to say that our company has tried diligently to keep the plants going and to give all of you work, but we want to run our business peacefully and for the best interest of all concerned. I feel, men, that we can settle all of our problems coming up bearing in mind the welfare of our employees, realizing they are closely related with the welfare of our company and the community in general.

"Mr. Harrison Hull: It seems something will have to be done and we want to do what you think best and I am sure you are right, but with the present union conditions I feel we would be one jump ahead of outside union agitators.

"Mr. Nerlich: I will try to answer as far as possible all questions coming up. I know you are going to have problems and questions to settle and I will, of course, try to answer any of your questions that the law will permit. You must remember what you do will be of your own accord and entirely independent of the company. I want you men to know that we have no fear of dealing with you fellows.

"It is hard for me not to be able to talk with you more freely, but I feel sure if you will make up your minds and get together on it you will work it out so it will be satisfactory with all concerned.

"Our company, of course, will have no company union, but if you feel you want an independent organization the company will, of course, co-operate with you.

"I want you to know that the International Shoe Company has always kept your welfare in mind and will continue to do so always. I appreciate your friendship and confidence in coming to me and I want to say you are all free to feel at liberty any time to come in with your problems and we will talk them over.

"Mr. Broaddus: Mr. Nerlich, we want to say again that we appreciate your courtesy and privilege that we have always had in coming to you with whatever was on our minds and we want you to know that no matter what we do or how we do it that we extend you the same courtesy to come to us with anything that you may feel is not to the best interests of the International Shoe Company and its employees.

"Mr. Nerlich: Mr. Broaddus, we appreciate that statement and the spirit that prompts it."

One who studies the record of this conference to find in it evidence that the Shoe Company dominated the formation of the Brotherhood will be at a loss, we think, to find that evidence. It seems to us that the superintendent had in mind a studied effort not to influence the employees in any way and that his precaution of having a record made goes far to prove conclusively that such was his intention. Where, in what Nerlich said to the employees, did the Board, and where does learned counsel for the Board, find domination of employees, an effort to influence them to form a local organization? It will be interesting to see how the Board finds, in what so obviously was intended to demonstrate neutrality, substantial evidence of domination and interference. Fairness to the Board requires that its reliance on what Nerlich said should be stated in the language used by the Board and by its counsel.

In the Board's decision certain sentences and parts of sentences are lifted out of what Nerlich said. We indicate here all of them. The first is set out in this quotation from the Board's decision —"In reference to the community Nerlich said at the conference of June 18: '* * * I am sure you men realize that a thing of this kind is of very vital interest to the community. * * *' And again, 'I feel, men, that we can settle all our problems coming up bearing in mind the welfare of our employees, realizing they are closely related with the welfare of our company and the community in general.'"

In this excerpt the word "community" is seized upon. Nerlich used the word "community!" When he did that, so runs the argument, he assumed responsibility for and endorsed "the prevailing community opinion that organization by outside groups might result in the curtailment or withdrawal of the respondent's pay rolls." Here is where the "background" is thought to be relevant. Nerlich should have attempted "to dispel the prevailing community opinion." When he used the word "community," when he did not affirmatively oppose what the Board assumes was "the prevailing community opinion," in effect he said to the employees: "The company is against unions organized from the outside, it urges the formation of a local organization." Such is the argument.

The second reference to what Nerlich said is contained in the following paragraph from the Board's decision—

"Nerlich's remarks were guarded. His statements were made conditionally. '* * If you feel that it has come to a show down, as Mr. Broaddus says, and that it is to your best interest, I think certainly it would be an all right thing to do.' '* * * If you plan an independent organization I am sure you will work out your own problems and still keep in mind what is best.' But his statements are to be read in connection with the prior expression of the delegation, who had stated tentatively their desire to form an independent organization subject to the re-

spondent's approval. By thus adopting their premise ('if you feel, etc.' and 'If you plan, etc.') and giving his approval conditioned on the group's wish (already expressed in tentative form), Nerlich effectively gave the plan the respondent's sanction."

It will be noted that, because Nerlich referred to what members of the delegation had said, he adopted "their premise" and "effectively gave the plan the respondent's sanction."

The third reference in the decision to what Nerlich said is to his statement—"I think you would do well to see men that you know and have confidence in and sit down and talk to them about it. Mr. Hodgdon, Mr. Sparks, Judge Bigger, Father Fox, Rev. Schwehn, J. B. Robinson, and Sinclair Mainland would be good men to see. * * *" (Hodgdon had been prominent in the Chamber of Commerce, Robinson and Mainland had been mayors of Hannibal, Fox was the local Catholic priest, Schwehn the Lutheran clergyman, Bigger was probate judge and a former Grandmaster of the Masonic Lodge.)

We now set out the exact words of the Board's comment concerning the matter in this last-mentioned reference: "The views concerning labor organization * * of some mentioned by Nerlich * * * must have been known to Nerlich * * *. Nerlich admitted knowing that Robinson had some trouble with union organizers during his term of office * * *. Nerlich or his superiors were charged with notice, through Brown's clipping service * * *, of the Mainland election campaign. It is likely that the respondent was aware of the anti-union activity of Hodgdon. * * * There is no showing as to Sparks or Judge Bigger or to the clergymen. * * * When * * * Nerlich endorsed these men he was endorsing the practices which they were known to have engaged in and the opinions they were known to have * * * it is as if Nerlich, being asked for advice, had declined to commit himself directly but had referred instead to a book or pamphlet setting forth anti-union views and had given it his endorsement. * * *"

The next reference in the decision to what Nerlich said is this excerpt from his statement: "Under the present conditions I want to say that our company has tried diligently to keep the plants going and to give all of you work, but we want

to run our business peacefully and for the best interest of all concerned." When he used this language, says the Board, "* * * he adopted the thesis put forward by the Brotherhood organizers, that the advent of national trade unions might result in disorder, and he implied that the respondent's continued operation of its factories might be jeopardized thereby."

The final reference in the decision to the statement by Nerlich is in this quotation: "I put you off two years ago because at that time I thought it would foster more trouble. Conditions have changed since then and we are having labor trouble all over the country. I believe you realize the seriousness of the situation enough and if you plan an independent organization I am sure you will work out your own problems and still keep in mind what is best." The Board says that—"Here the organizers plainly were told to proceed."

We have used the very language of the Board (to which the brief of counsel adds nothing) in its statements of its conclusions and inferences from the interview of Nerlich with the organizers of the Brotherhood. Any extended comment, we feel, is unnecessary. Some restraint is exercised when we say only that a hodgepodge of suspicions, far-fetched inferences and pure guesses, the like of this one, not often has been built up.

The Board relied for its finding that the Shoe Company dominated the Brotherhood and its formation, not only on Nerlich's stenographically reported interview with employees but also on an interview with Nerlich reported in the Hannibal Courier-Post. While there was no showing that Nerlich ever gave the interview and while, almost at least, it may be judicially noticed that newspaper interviews are not always absolutely accurate verbatim statement of what was said and of all that was said, still we set out here in full this "interview." In it this statement was ascribed to Nerlich—

"We have learned recently that some of our employees are sponsoring a local employees' association for the purpose of representing the employees of the company in dealing with us on problems of mutual interest.

"Choice of representation is a matter which must be settled by the employees themselves. For many years the finest kind of relations has existed between us

and our employees. We are anxious to preserve that relationship and are confident that our employees share the same feeling in the plan that they are trying to work out.

"It is gratifying to us to recall our experience of more than thirty years in Hannibal; and any plan designed to serve the best interest of our employees and the best interest of the city of Hannibal is entitled to thoughtful consideration by all."

But how is anything in this interview, assuming it is an accurate report, indicative of domination of the Shoe Company over the Brotherhood and its formation? Counsel for petitioner in the brief concede that it seems "innocuous." But in the most fantastic fashion the Board and counsel find hidden meanings in innocent words and phrases, almost as if the interview had been written in some abstruse code. For example, Nerlich is quoted as saying to the reporter: "For many years the finest kind of relations has existed between us and our employees." That, say counsel, "was an encomium only of the period during which no agency for collective bargaining existed * * *." Again, Nerlich's anxiety to preserve the "finest kind of relationship" between the company and its employees, say counsel, was meant to convey to employees the idea "that they should not expect or demand any real change by the introduction of the Brotherhood." Again, the statement attributed to Nerlich that "any plan designed to serve the best interest of our employees and the best interest of the city of Hannibal is entitled to thoughtful consideration by all," counsel say, "amounted to an endorsement of the Brotherhood."

Once more we observe that extended comment is unnecessary. Indeed extended comment is impossible, where there is such labored distortion of innocent and harmless remarks, if ever they were made by Nerlich, such distortion as that he is said to have meant the opposite of what actually he said.

We do not discuss other slight bits of evidence to which the Board points. They are trifling in importance and their significance either is exaggerated out of all proportion to their true meaning or so distorted as to be given a meaning contrary to the intention of the actors.

## Conclusion

 The record sent up contains nearly 12,000 typewritten pages of testimony and exhibits. Aided by the briefs, which have served as indices of sorts, we have examined and searched this record. We have found nothing that one trained in the law and true to the traditions of the law would characterize as substantial evidence, even as a scintilla of evidence, nothing that within the more liberal standards of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., can be called substantial evidence, nothing to support the findings adverse to the Company and the order bottomed on those findings. There must be substantial evidence to support the findings. Title 29, Sec. 160(e) (f), U.S.C.A.; Consolidated Edison Company v. Labor Board, 305 U. S. 197, 227, 59 S.Ct. 206, 83 L.Ed. 126; Washington V. & M. Coach Company v. Labor Board, 301 U.S. 142, 147, 57 S.Ct. 648, 81 L.Ed. 965; Cupples Co. Manufacturers v. Labor Board, 8 Cir., 106 F.2d 100, 113. There was no such evidence. Accordingly the petition of the Board for an order affirming and enforcing the Board's order should be and it is denied.